## Commonwealth *v.* Stoffan, Appellant.

128

Argued November 14, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, CERCONE, and SPAETH, JJ. (SPAULDING, J., absent.)

*Richard H. Martin*, with him *Harold Gondelman*, and *Baskin, Boreman, Wilner, Sachs, Gondelman & Craig*, for appellant.

*D. Michael Fisher*, Assistant District Attorney, with him *Robert L. Eberhardt*, Assistant District Attorney, and *Robert W. Duggan*, District Attorney, for Commonwealth, appellee.

OPINION BY SPAETH, J., June 21, 1974:

Appellant is a licensed medical doctor. He was indicted on six counts of violating §13(a)(14) of The Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, P. L. 233, No. 64, 35 P.S. §780-113(a)(14), which prohibits the "prescription by any practitioner otherwise authorized by law so to do of any controlled substance except after a physical or visual examination of the person . . . for whom said drugs are intended, said examination to be made at the time said prescription order is issued . . . , or except where the practitioner is satisfied by evidence that the person is not a drug dependent person."

The trial judge sitting without a jury found appellant not guilty on Count I and guilty on Counts II through VI. He fined appellant $10,000 and sentenced him to two separate and consecutive one year terms of imprisonment.

## I.

The facts surrounding the charges were developed exclusively in the testimony of Thomas L. Short, a detective of the Pittsburgh Police Department assigned to the Narcotics Bureau of the Organized Crime Division. Each count in the indictment stems from a visit Detective Short made to appellant's office.

COUNT I. On Wednesday, August 30, 1972, Detective Short, posing as a prospective patient, went to appel-

lant's office. It was his first visit. After a forty minute wait, he was called into the examining room. He described the room as being bright because of fluorescent lighting and daylight filtering through the windows. Appellant took a seat behind a desk; Short took a seat on the other side of the desk not more than an arm's length from appellant. Short told appellant that he was working two jobs and needed something to keep him "up" or "high." After recording Short's name, address and telephone number on an index card, appellant took Short's weight, checked his blood pressure, and used a stethoscope on his chest. Appellant made the following notation on the index card: "Depressive state—obesity—194 lbs."[1] He then wrote two prescriptions, each for 12 capsules of Biphetamine 20 Dexedrine Sulfate, which is classified as an amphetamine under Schedule II of §4 of the Controlled Substances Act, 35 P.S. §780-104(a).[2] One prescription was dated "8-29-71" [*sic*] and the other, "31 August, 1972." Appellant told Short that he could take two or three a day to get high, and that his fees were $10 for the first prescription, and $7 for any thereafter. Short gave appellant $17. Appellant warned Short not to present the prescriptions together and told him that if he were questioned he should reply that he was overweight. Appellant informed Short that he could return on Friday or Saturday for "something stronger." Short then left.

COUNT II. Short made his second visit to appellant on Friday, September 8, 1972. He arrived at 9:30 p.m. The doorway and hallway were occupied by people. Short stepped inside the door and stood in the hallway,

---

[1] The record does not indicate Short's height.

[2] *See generally*, Note, Control of Amphetamine Prescription and Production: Critical Analysis of Federal, State and Local Efforts to Control Amphetamine Abuse, 8 Colum. J. of L. & Social Problems 401 (1972).

which was well lighted with fluorescent fixtures. Shortly thereafter, appellant emerged from his examining room, saw Short, and asked him if he wanted the same or "a couple of doubles." Short said he wanted the doubles. At this time appellant and Short were about three feet from each other. Five minutes later, appellant handed Short two prescriptions and told him that the price would be $28. Short inadvertently gave appellant a $20 bill and two $10 bills. Appellant gave Short $2 and returned the extra ten. The prescriptions were each for twenty-four capsules of Biphetamine 20. One was dated "9-6-72" and the other, "9-9-72."

COUNT III. On Friday, September 15, 1972, Short arrived at appellant's office at 1:20 p.m. A man and a woman were on the porch when he arrived. A sign on the outer door stated that appellant would return at 7:00. Appellant, however, soon opened the door and chastised the three persons standing on his porch, saying they should have been there at 12:30. After they had entered the waiting room, appellant stated, ". . . you people know that I take care of the group on 12:30 on Mondays, Wednesdays and Fridays. . . ." Fifteen minutes later appellant was called into the examining room. Appellant sat at his desk and Short sat in the nearby chair just as he had during his first visit. Appellant wrote two prescriptions, each for twenty-four tablets of Desoxyn, 15 milligrams. Desoxyn is classified under Schedule II as an amphetamine. The prescriptions were dated "9-13-72" and "9-16-72." Appellant gave Short the prescriptions in return for $28 and reminded Short that he was not to present them at the same time and place. He told Short that he could return for more on Wednesday.

COUNT IV. On Wednesday, September 20, 1972, Short arrived at appellant's office at 12:55 p.m. After a wait of forty-five minutes, Short went into the examining room and as before sat down in the chair opposite

appellant, who was seated at the desk. Short asked for "a couple of doubles." Appellant wrote two prescriptions, one dated "9-19-72," the other, "9-22-72," each for twenty-four capsules of Bipetamine 20. Appellant told Short that he was not to return until the following week. After saying, ". . . legally I can only write three days in advance, but if you want another double I'll write it, but be careful," appellant wrote a third prescription, dated "9-29-72," for "20 caps" of Biphetamine 20. Short gave appellant $42. Appellant instructed Short to "take the most recent dated prescription of the three and keep it handy. Take the other two and put them somewhere else on yourself." Appellant explained: "[I]n case a narcotics agent grabs you or follows you he'll think you have the one legitimate prescription with you."

COUNT V. On Wednesday, September 27, 1972, Short arrived at appellant's office at 12:45 p.m. and ten minutes later was admitted into the examining room. Appellant asked Short what he was doing with the pills and appellant replied that he was using them at the rate of two or three a day. Appellant asked Short if he was giving some to his wife and Short replied that he was. Appellant said perhaps a prescription could be put in her name but decided against doing so. Appellant wrote two prescriptions, each reading, "capsules Biphetamine 20, 20 caps." One was dated "9-27-72" and the other, "9-29-72." Short paid appellant $28. As Short was leaving, appellant said he hoped Short was not selling the drugs. Short assured him that he was not. Appellant told him he could come back on Friday.

COUNT VI. Short paid his final visit to appellant's office on Monday, October 9, 1972. He arrived at 12:45 p.m. and two hours and ten minutes later was admitted into the examining room. Short and appellant occupied their usual seats at the desk. Appellant stated that he

would not write prescriptions in advance. Instead he wrote three prescriptions, each for "caps Biphetamine 20, 20 caps," dated September 3rd, 6th, and 9th. Short paid appellant $42.

At no time material to this case was Short taking or addicted to a narcotic drug, nor did he feign any symptoms of drug use. He never complained of any physical or emotional ailments, nor was he asked by appellant if any existed. None of the prescriptions appellant gave him was ever filled.

## II.

The first question that must be considered is how to define the crime with which appellant was charged.

It will be recalled that §13(a)(14) of the Controlled Substances Act—the provision that appellant was convicted of violating—prohibits prescription "except after a physical or visual examination . . . or except where the practitioner is satisfied by evidence that the person is not a drug dependent person." Apparently the trial judge (and the attorneys for appellant and the Commonwealth) construed these two clauses as stating "exemptions or exceptions." The importance of this conclusion is that Section 21 of the Controlled Substances Act, 35 P.S. §780-121, provides: "In any prosecution under this act, it shall not be necessary to negate any of the exemptions or exceptions of this act in any complaint, information or trial. The burden of proof of such exemption or exception shall be upon the person claiming it."[3] Under this view it was necessary

---

[3] There was a similar provision in §22 of The Drug, Device and Cosmetic Act, Act of Sept. 26, 1961, P. L. 1664, 35 P.S. §780-22: "In any prosecution under this act, it shall not be necessary to negative any of the exemptions of this act in any complaint, information or indictment. The burden of proving any exemption under this act shall be upon the defendant." This follows §18 of the

for the Commonwealth to prove only the "prescription by [appellant] . . . of any controlled substance;" to avoid conviction, appellant then had to prove by way of defense one of two facts: either that the prescription had been "after a physical or visual examination;" or that he had been "satisfied by evidence that [Detective Short was] not a drug dependent person." We disagree with this view. We have concluded that the "except" clauses do not state defenses but rather define necessary elements of the crime of unlawful prescription which the Commonwealth had to prove.

Our point of departure is the fact that the reference in §21 to "exemptions and exceptions" is ambiguous. Section 13 is entitled "Prohibited Acts—Penalties." Subsection (a) lists prohibited acts, and subsections (b) through (f) list penalties. There are a number of subsections of subsection (a) that contain clauses beginning with "except."[4] There are also a number of clauses beginning with "unless."[5] Some subsections

---

Uniform Narcotic Drug Act in placing the burden specifically on "the defendant." The last sentence of §21 of the Controlled Substances Act is taken from §506 of the Uniform Controlled Substances Act. The change in reference from "the defendant" to "the person claiming [an exemption or exception]" is explained by the fact that both the Uniform and Pennsylvania Controlled Substances Acts have provisions relating to administrative proceedings in which the person claiming an exemption or exception is not technically a "defendant."

[4] For example, §13(a)(10) prohibits: "The sale at retail of a nonproprietary drug except by a registered pharmacist in a licensed pharmacy or by a practitioner." See also subsections (11), (13), (14), (15), (16), (24), and (30).

[5] For example, §13(a)(18) prohibits: "The selling by a pharmacy or distributor of any controlled substance or other drug unless the container bears a label, securely attached thereto, stating the specific name of the drug and the proportion or amount thereof unless otherwise specifically directed in writing by the practitioner." See also subsections (13), (15), and (16).

have both "except" and "unless" clauses.[6] In a few there is a provision that appears to make an exception without saying "except" or "unless."[7] Under a literal interpretation of §21, all of these provisions could be read as stating "exemptions" or "exceptions," which a defendant must prove in order to escape conviction, rather than elements of the crime charged. It may be

---

[6] For example, §13(a)(13) prohibits: "The sale, dispensing, distribution, prescription or gift by any practitioner otherwise authorized by law so to do of any controlled substance to any person known to such practitioner to be or whom such practitioner has reason to know is a drug dependent person, unless said drug is prescribed, administered, dispensed or given, for the cure or treatment of some malady other than drug dependency, except that the council, in accordance with Federal narcotic and food and drug laws, shall allocate the responsibility for approving and designating certain clinics, and shall provide or allocate the responsibility for providing regulations for such clinics at which controlled substances, including but not limited to methadone, may be prescribed, administered or dispensed for the treatment of drug dependency. This clause shall not prohibit any practitioner from prescribing, distributing or dispensing any controlled substance on a short term basis pending confirmed admission of the patient to a hospital or rehabilitation center." See also subsections (15) and (16).

[7] For example, §13(a)(15) prohibits: "The sale at retail or dispensing of any controlled substance listed in Schedules II, III and IV to any person, except to one authorized by law to sell, dispense, prescribe or possess such substances, unless upon the written or oral prescription of a person licensed by law to prescribe such drug and unless compounded or dispensed by a registered pharmacist or pharmacy intern under the immediate personal supervision of a registered pharmacist, or the refilling of a written or oral prescription order for a drug, unless such refilling is authorized by the prescriber either in the original written prescription order or by written confirmation of the original oral prescription order. The provisions of this subsection shall not apply to a practitioner licensed to prescribe or dispense such drugs, who keeps a record of the amount of such drugs purchased and a dispensing record showing the date, name, and quantity of the drug dispensed and the name and address of the patient, as required by this act." See also the last sentence of subsection (13).

doubted that the General Assembly meant to paint with such a broad brush. There are so many "except" and "unless" clauses, and they refer to such different situations, that it is difficult to suppose that they were all regarded by the General Assembly as of equal status or significance and that they therefore were all intended to set forth an "exemption" or "exception" within §21.

The ambiguity in §21 as to which of the "except" and "unless" and similar clauses of §13(a) constitute "exemptions or exceptions" can easily be resolved if we heed the basic rule of statutory construction that it will be presumed that the General Assembly intended a constitutional result. 1 Pa. S. §1922(3). Accordingly, "exemptions or exceptions" must be construed to include only those clauses in §13(a) that do not state necessary elements of the crimes the General Assembly intended to proscribe. This conclusion is required because "the Due Process Clause [of the United States Constitution] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).[8] Thus the burden of proving necessary elements of a crime must rest on the Commonwealth. If "exemptions or exceptions" referred to clauses that stated necessary elements and §21 operated to shift the burden of proof as to them onto the defendant, due process would be violated. We are therefore obliged to include within the phrase "exemptions or exceptions" only those clauses in §13(a) that do not state necessary elements of the crimes proscribed. Clauses that state necessary

---

[8] The same standard of proof is required by Pennsylvania law. *Commonwealth v. Young*, 456 Pa. 102, 317 A. 2d 258 (1974); *Commonwealth v. O'Neal*, 441 Pa. 17, 20 n.1, 271 A. 2d 497, 499 n.1 (1970); Pa. Const. art. 1, §9 (due process).

elements of the crimes will not be deemed to state "exemptions or exceptions," and §21 will not operate to shift the burden of proof as to them onto the defendant.

The problem of deciding whether a particular clause states a fact that constitutes a necessary element of the crime is a problem of statutory construction. The answer depends on what behavior the General Assembly intended to prohibit.[9] Any language referring to such behavior states a necessary element of the crime.

---

[9] There are some due process limitations on the definitions of crimes, see, e.g., Leary v. United States, 395 U.S. 6 (1969) (statutory presumptions must meet the more-likely-than-not test) ; Robinson v. California, 370 U.S. 660 (1962) (status cannot be a crime), but we find no such limitation in Winship. As noted in United States ex rel. Tate v. Powell, 325 F. Supp. 333, 335 (E.D. Pa. 1971), "[i]t is one thing to say that proof of every element of the crime beyond a reasonable doubt is constitutionally mandated; it is quite a different thing to say that the Constitution requires that a state define the elements of its own internal crimes in a particular way." We note that in reaching our conclusion we found most useful Stump v. Bennett, 398 F. 2d 111 (8th Cir.), cert. denied, 393 U.S. 1001 (1968) (burden of persuasion as to alibi cannot be shifted to the defendant since proof of his presence at scene is an "indispensable factor" of government's case). There are a few pertinent Pennsylvania decisions as well, but they are of limited aid. Commonwealth v. Vogel, 440 Pa. 1, 268 A. 2d 89 (1970), which deals with the burden of proof on the issue of sanity, must be read with Commonwealth v. Zlatovich, 440 Pa. 388, 269 A. 2d 469 (1970). See Commonwealth v. Simms, 228 Pa. Superior Ct. 85, 101, 324 A. 2d 365, 379 (1974) (opinion by SPAETH, J., suggesting that the Supreme Court's approach in these two cases is not altogether consistent with the requirements of In re Winship, supra). Commonwealth v. Johnston, 438 Pa. 485, 263 A. 2d 376 (1970), is relevant but somewhat confusing. There the Supreme Court held that self-defense was an affirmative defense that the defendant must prove but went on to say that where the Commonwealth's evidence shows self-defense, all the essential elements have not been proved beyond a reasonable doubt. In Commonwealth ex rel. Butler v. Rundle, 429 Pa. 141, 239 A. 2d 426 (1968), it was held that the voluntariness of a confession is not an essential element that the Commonwealth must prove.

In considering this problem, a useful case is *Commonwealth v. Neal*, 78 Pa. Superior Ct. 216 (1922). There the statute in question made it a crime "for any person . . . to engage in the practice of medicine . . . except those hereinafter exempted. . . ." In the indictment the Commonwealth had not alleged that the defendant was not one of those exempted. Whether such an allegation was necessary depended on whether the exemption clauses referred to facts constituting elements of the crime. If they did, the allegation was necessary. In deciding whether the exemption clauses referred to elements this court enunciated the following test: "When a statute defining an offense contains an exception, in the enacting clause, which is so incorporated with the language defining the offense that the ingredients of the offense cannot be accurately and clearly described if the exception is omitted, the rules of good pleading require that an indictment founded upon the statute must allege enough to show that the accused is not within the exception, but if the language of the clause defining the offense is so entirely separable from the exception that the ingredients constituting the offense may be accurately and clearly defined without any reference to the exception, the pleader may safely omit any such reference, as the matter contained in the exception is matter of defense and must be shown by the accused." *Id.* at 219.

When applied to the statute in question, this test led to the conclusion that the exemption clauses did not refer to elements; thus, the Commonwealth did not have to allege them in the indictment; rather, "[i]f [the defendant] is within the exceptions it is for him to show it at the trial." *Id.* at 222.[10]

---

[10] Among the cases applying the same rule are: *Commonwealth v. Bitzer*, 163 Pa. Superior Ct. 386, 62 A. 2d 108 (1948) (some independent contractors excepted from statute prohibiting the ren-

In deciding under *Neal* whether the language of an exception clause refers to an ingredient or to a matter of defense, a number of different factors must be considered: the wording of the exception and its role in relation to the other words in the statute; whether in light of the situation prompting legislative action, the exception is essential to complete the general prohibition intended; whether the exception makes an excuse or justification for what would otherwise be criminal conduct, *i.e.,* sets forth an affirmative defense; and whether the matter is peculiarly within the knowledge of the defendant. 1 C. E. Torcia, Wharton's Crim. Evid. §20 (13th ed. 1972). *See also State v. Porter*, 28 Utah 2d 364, 502 P. 2d 1147 (1972); 1 Pa. S. §1921(c).

It will be observed that the problem here is somewhat different from that presented in *Neal*. Section 21 has specifically allocated the burden of proof of "exemptions or exceptions" to the defendant; in *Neal* the legislature had failed to allocate the burden of proof as to matter stated in the form of an exception. This difference, however, is unimportant. In *Neal* the court was obliged to decide essentially the same question as is presented here, *i.e.,* whether a clause phrased like an exception states a necessary element of the crime with which the defendant is charged, in which case the burden of proving the exception rests on the Commonwealth.

---

dering of service as a public utility without a certificate of convenience); *Commonwealth v. Harrison*, 137 Pa. Superior Ct. 279, 8 A. 2d 733 (1939) (statute barred sale of securities by unregistered dealers; definition of dealer excepted those involved in limited transactions); *Commonwealth v. Batch*, 120 Pa. Superior Ct. 592, 183 A. 108 (1936) (excepted manufacturers, licensees, and permit holders from statute making possession of liquor illegal); *Commonwealth v. Wenzel*, 24 Pa. Superior Ct. 467 (1904) (statute making the sale of liquor unlawful excepted license holders).

142

We have no doubt that it is appropriate to rely on the *Neal* rule in determining whether the §13(a) clauses state necessary elements. In *State v. Lynch,* Iowa Sup. Ct. 197 N.W. 2d 186 (1972), the court had before it two provisions of the Iowa drug law, which was modeled after the Uniform Narcotic Drug Act. One provision forbade all possession of narcotic drugs "except as authorized by this chapter;" the other, modeled after §18 of the Uniform Act,[11] allocated the burden of proof as to "any exception, excuse, proviso, or exemption" to the defendant. The defendant argued that it was unconstitutional to impose the burden of proof as to the exceptions upon him. The court disagreed. In finding that the defendant could constitutionally be so burdened it relied on a test substantially the same as that enunciated in *Neal*: "If an exception is material in arriving at the definition of the crime, it is generally held the State has the burden of showing the exception does not apply because it is then one of the essential elements of the offense. However, where the exception merely furnishes an excuse for what would otherwise be criminal conduct, the duty devolves upon the defendant to bring himself within the exculpatory provision. State v. Snyder, 244 Iowa 1244, 1249, 59 N.W. 2d 223, 226 (1953); State v. DeMarce, 237 Iowa 648, 649-654, 23 N. W. 2d 441, 442-444 (1946); 1 Underhill on Criminal Evidence, Fifth Ed., sections 52, 53, pages 88-90; 22A, C.J.S., Criminal Law, section 571, page 315; Stanley v. State (Ind. 1969), 245 N.E. 2d 149, 151; State v. Kahler (Fla. 1970), 232 S. 2d 166, 168; State v. Belanger (1961), 148 Conn. 57, 167 A. 2d 245, 248; State v. Rowe (Maine 1968), 238 A. 2d 217, 221; State v. Seng, 91 N.J. Sup. 50, 219 A. 2d 185, 186 (1966). See also Annotation at 153 A.L.R. 1249." 197 N.W. 2d at 190-91.

---

[11] See note 4, *supra.*

Applying the *Neal* rule to the two "except" clauses in §13(a)(14), we have concluded that the clauses refer to facts that constitute necessary elements of the crime, and that accordingly they are not embraced by the reference in §21 to "exemptions and exceptions."

We consider it unlikely that the General Assembly intended to prohibit the mere "administration, dispensing, delivery, gift or prescription" of a controlled substance. Reading §13(a)(14) as a whole, it appears that rather than intending a general prohibition against the administration of drugs, what the General Assembly was concerned with was controlling the methods a practitioner employs, and the data he has at hand, when he administers drugs. In this view, the "except" clauses do not refer to matters separable from the prohibited conduct but rather are indispensable in defining that conduct.

In addition to this consideration is the fact that to regard the "except" clauses as part of the definition of the crime results in what would appear to be a reasonable allocation of the burden of proof. In *Neal*, the exemption clause referred to the defendant's status. For example, a defendant was exempt from the prohibition of the statute if he were a United States Army medical officer. To require a defendant to prove this, as the court in *Neal* did, would impose no hardship on him. In contrast, here the "except" clauses do not involve mere status but a practitioner's method of practice. This presents a situation somewhat comparable to that presented in *United States v. Vuitch*, 402 U.S. 62 (1971). There it was necessary to construe a District of Columbia statute that forbid abortions "unless the same were done as necessary for the preservation of the mother's life or health." The District Court held that the "unless" clause stated a defense that the defendant must prove. On appeal, the Supreme Court reversed, stating: "Placing such a burden of proof on

a doctor would be peculiarly inconsistent with society's notions of the responsibilities of the medical profession. Generally, doctors are encouraged by society's expectations, by the strictures of malpractice law and by their own professional standards to give their patients such treatment as is necessary to preserve their health. We are unable to believe that Congress intended that a physician be required to prove his innocence. We therefore hold that . . . the burden is on the prosecution to plead and prove that an abortion was not "necessary for the preservation of the mother's life or health." *Id.* at 71. Considering the legitimate medical uses to which drugs may be put, we have likewise concluded that the General Assembly did not intend to impose the burden of proof on the practitioner whenever any administration of a controlled substance is challenged.

## III.

It will be observed that the prohibition of §13(a) (14) is worded so as to proceed from the general to the exceptional: the practitioner may issue no prescription of any controlled substance "except after a physical or visual examination . . . made at the time said prescription is issued . . . , or except where the practitioner is satisfied by evidence that the person is not a drug dependent person."

"In its ordinary usage, the word 'or' is a disjunctive particle, which expresses mutually exclusive alternatives." *Klein v. Wilson,* 36 D. & C. 2d 407, 410 (1964). The language, "except after . . . , or except where . . . ," makes it clear that the legislature intended to provide for two distinct situations in which prescription of a controlled substance is not prohibited.[12] Thus the Com-

---

[12] Thus, if the practitioner conducts the required examination, he escapes responsibility even though he was not satisfied by evi-

monwealth to sustain its burden must establish that neither situation existed.

To allow the Commonwealth to prove that only one of the situations described in the two "except" clauses did not exist would require the word "or" between the two clauses to be read as "and." However, as stated in *Garratt v. Philadelphia*, 387 Pa. 442, 445, 127 A. 2d 738, 740 (1956) : " 'Or' can . . . be construed to mean 'and' when to give the word 'or' its ordinary meaning would be to produce a result that is absurd or impossible of execution or highly unreasonable or would manifestly change or nullify the intention of the legislative body." Nothing about our construction of §13 (a) (14) is "absurd or impossible of execution or highly unreasonable." It is moreover consistent with a legislative intention to extend to the practitioner a choice he did not have before.

The predecessor of §13(a)(14) was §4(w) of the Drug, Device and Cosmetic Act, Act of Sept. 26, 1961, P. L. 1664, 35 P.S. §780-4(w). §4(w) prohibited "[t]he . . . prescription by any practitioner . . . of any narcotic drugs other than those exempted by regulation except after a physical examination of the person . . . for whom

---

dence that the person for whom he was prescribing was not drug dependent, whereas if he is satisfied by evidence that the person is not drug dependent, he escapes responsibility even though he made no examination of the person. It should be noted that §13 (a) (13) of the Controlled Substances Act, 35 P.S. §780-113 (a) (13), prohibits "prescription . . . by any practitioner . . . to any person known to such practitioner to be or whom such practitioner has reason to know is a drug dependent person, unless said drug is prescribed . . . for the cure or treatment of some malady other than drug dependency. . . ." Whereas §13(a)(14) is aimed at controlling the manner in which controlled substances are dispensed, §13(a) (13) focuses on the person to whom they are dispensed. No reason appears why a practitioner who would not be liable under §13(a) (14) because he conducted an examination cannot be charged under §13(a)(13).

said drugs are intended, said examination to be made at the time said prescription is issued . . . by said practitioner. . . ."

It will be noted that §4(w) differs from §13(a)(14) in two respects. First, §4(w) did not apply to so much of a doctor's medical practice as does §13(a)(14). It applied only to the prescription of "narcotic drugs." These were defined in such a way as to distinguish them from "dangerous drugs." §§2(g) and 2(h), 35 P.S. §§780-2(g) and 780-2(h). Whereas, "narcotic drugs" included, for example, opium, cocoa leaves, and marihuana, "dangerous drugs" included, for example, "a drug other than a narcotic drug . . . which . . . because of its toxicity or other potentiality for harmful effect . . . has been found . . . not safe for use except under the supervision of a practitioner licensed by law to administer such drug. . . ." In contrast, §13(a)(14) extends to the prescription of "controlled substances." These are defined to include a number of drugs that would formerly have been labeled "dangerous," as, for example, the amphetamines involved in the present case. *See* §4, 35 P.S. §780-104. Second, §4(w) required a "physical examination" before the prescription of a narcotic drug, whereas §13(a)(14) permits prescription either "after a physical or visual examination" or when "the practitioner is satisfied by evidence that the person is not a drug dependent person." This extension to practitioners of greater latitude in choosing the method of dispensation is consistent with a broadening of the number and kinds of drugs regulated.

## IV.

It having been decided that the Commonwealth has the burden of proving that a practitioner is not within either of the two "except" clauses of §13(a)(14), two questions remain for consideration: What must the

Commonwealth show to prove that the practitioner when issuing a prescription did not conduct a "physical or visual" examination? And what must it show to prove that the practitioner was not "satisfied by evidence that the person [to whom the prescription was issued] [was] not a drug dependent person?"

Appellant argues that "[a] face-to-face meeting between a patient and his physician, when prescriptions are issued by said physician to the patient, constitutes a visual examination."[13] He contends that this definition is mandated by two maxims of statutory construction: (1) that words should be construed according to their common usage, 1 Pa. S. §1903(a); and (2) that penal statutes should be strictly construed, 1 Pa. S. §1928(b). The Commonwealth, on the other hand, argues that "visual examination" should be regarded as a technical medical term, to be interpreted "in light of currently accepted medical practices and principles. *See* 1 Pa. S. §1903(a) ("technical words and phrases . . . shall be construed according to . . . peculiar and appropriate meaning or definition"). It bolsters this argument by referring us to §11(d) of the Controlled Substances Act, 35 P.S. §780-11(d), which provides: "A practitioner may prescribe, administer, or dispense a controlled substance or other drug or device only (i) in good faith in the course of his professional practice, (ii) within the scope of the patient relationship, and (iii) in accordance with treatment principles accepted by a responsible segment of the medical profession." This provision, the Commonwealth urges, should be

---

[13] The trial judge held that the facts proved under the first count revealed that appellant had conducted a "physical examination" of Detective Short on the occasion of the detective's first visit. He therefore found appellant not guilty on that count. Appellant does not claim that he conducted a "physical examination" at any of the detective's later visits; he only claims a "visual examination" then.

construed together with §13(a)(14), since both sections relate to practitioners. 1 Pa. S. §1932.

To accept appellant's argument would mean that the legislature intended that a practitioner could prescribe any controlled substance for anyone simply upon seeing him. There is no reason to suppose that the legislature intended such a result. It is hardly consistent with its use of the term "examination," which is synonymous with "search," "investigation," and "scrutiny." Webster's Third New International Dictionary 790 (1961). The Commonwealth's arguments are more persuasive.

As has been discussed, under §13(a)(14) a practitioner is given the choice of either conducting an examination or foregoing an examination when he is satisfied by evidence that a person is not drug dependent. The choice seems to be one between equivalents. When a practitioner chooses to conduct an examination, he should do so in a manner that will supply him with sufficient information to enable him to form an opinion that the patient is not drug dependent. What then constitutes a "physical or visual examination" will vary depending on the drug involved, the person being prescribed for, and how much information about the person the prescribing practitioner already has. Evidence of what "treatment principles [are] accepted by a responsible segment of the medical profession," §11(d), should indicate what a practitioner generally must do in order to obtain sufficient information to form an opinion that the patient is not drug dependent.[14] By considering what the practitioner has done in the particular circumstances, and by comparing his con-

---

[14] It should be noted that it is the practitioner's diagnostic techniques that are at issue, not the wisdom of his decision to prescribe. *Cf.* Note, *supra* Note 2, at 102-04 (indicating medical difference of opinion regarding the wisdom of using certain amphetamines in treatment).

duct with what a "responsible segment of the medical profession" would say should have been done, a determination may be made whether a "physical or visual examination" was conducted.

With respect to the Commonwealth's burden of proving that the practitioner was not "satisfied by evidence that the person is not a drug dependent person," the relevant question is whether the defendant practitioner was satisfied, not whether a reasonable practitioner would be satisfied. It is not unusual for a criminal statute to require that the Commonwealth's evidence of a particular element of an offense be judged by a subjective standard. *See, e.g.,* 18 Pa. S. §3502 (1973) (burglary defined as entry with the intent to commit a crime). Nor does such a requirement impose an unreasonable burden on the Commonwealth. Proof of a defendant's state of mind "may be found in the defendant's words or conduct or from the attendant circumstances together with all reasonable inferences therefrom. Commonwealth v. Carroll, 412 Pa. 525, 194 A. 2d 911 (1963); Commonwealth v. Bova, 180 Pa. Superior Ct. 359, 119 A. 2d 866 (1956)." *Commonwealth v. Freeman,* 225 Pa. Superior Ct. 396, 399, 313 A. 2d 770, 772 (1973). This principle is as applicable to proof of a practitioner's subjective satisfaction that a person for whom he prescribed was not drug dependent as it is to proof of an alleged burglar's intent.

It should be noted that the use of a subjective standard does not bar the introduction of expert testimony. The Controlled Substances Act defines a "drug dependent person" as one "who is using . . . a controlled substance . . . and is in a state of psychic or physical dependence, or both, arising from administration of that . . . controlled substance . . . on a continuing basis. Such dependence is characterized by behavioral and other responses which include a strong compulsion to take the . . . controlled substance . . . on a continuous

basis in order to experience its psychic effects, or to avoid the discomfort of its absence." §2(b), 35 P.S. §780-102(b). Expert testimony will be relevant to show: what dosages of a controlled substance would if administered on a continuing basis produce "psychic or physical dependence" in the person the practitioner prescribed for; what are the "responses" of a person dependent on the substance; and how a practitioner determines whether those responses are present. This evidence can then be compared with evidence of what information the practitioner had available and of what experience and expertise he brought to bear on evaluating that information. It will then be possible to infer whether the practitioner was not "satisfied by evidence that the person [to whom the prescription was issued] [was] not a drug dependent person."

## V.

Having defined what the Commonwealth's burden entails, we hold that it has not been met.

The record contains sufficient evidence to support a finding that appellant was not satisfied that Detective Short was not drug dependent. Particularly damaging are appellant's statements about the manner in which the detective should present the prescriptions for filling, how he should carry them on his person, what he should say if questioned, and when he should come to the office to pick up prescriptions.[15] However, there is almost no evidence on the question of whether appellant's face-to-face encounters with the detective consti-

---

[15] Appellant argues that such a finding is without foundation since "Short was *not* drug dependent, never had been, never displayed any medical symptoms thereof, and no competent medical practitioner could have concluded otherwise." Appellant's Brief at 13. Appellant misses the point. It is not important that Short was not in fact drug dependent; what matters is that appellant was not satisfied that he was not.

tuted "physical or visual examination[s]." Evidence of standard medical practice was crucial here and there was none.

The reason there was none is that on objection of appellant's counsel the Commonwealth was precluded from presenting the testimony of a psychiatrist who, according to the offer of proof, would have testified as to "what minimum standards would be regarding both physical and visual examinations prior to the prescription of . . . a controlled substance such as amphetamines including Biphetamine 20 or Desoxyn or Dexedrine sulphate." The trial judge's refusal to hear this testimony was error. As a result the Commonwealth could not establish its case, and there is no alternative but to find that appellant's convictions are not supported by sufficient evidence.

## VI.

Although the evidence against appellant was insufficent to support the verdict, this case will nonetheless be remanded for a new trial.

There can be no doubt that this court has the power to issue such an order. Section 504 of the Appellate Court Jurisdiction Act of 1970, Act of July 31, P. L. 673, No. 223, art. I, §101, 17 P.S. §211.504, reads as follows: "An appellate court may affirm, modify, vacate, set aside or reverse any order brought before it for review, and may remand the matter and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances."

Section 504 appears to be patterned after 28 U.S.C. §2106 (1973), which provides: "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree or order of a court lawfully brought before it for review, and may remand the cause and direct the entry

of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." Under this statute: "When a judgment of conviction is reversed for insufficiency of the evidence, the determination of whether the indictment should be dismissed or there should be a retrial rests within the discretion of the court. *See, e.g.,* Bryan v. United States, 338 U.S. 552, 70 S. Ct. 317, 94 L. Ed. 335 (1950); C. Wright, Federal Practice and Procedure, Criminal §470. When an appellate court exercises this discretion, it must look to the record, undertaking to ascertain if the prosecution had the opportunity fully to develop its case, or, in fact, did so. If it did, or if it appears that it was responsible for its failure adequately so to do, then it is not ordinarily fair that the successful appellant should be required to undergo another trial. *See, e.g.,* Davis v. United States, 382 F. 2d 221 (9th Cir. 1967); Gonzales v. United States, 374 F. 2d 112 (9th Cir. 1967); Whaley v. United States, 362 F. 2d 938 (9th Cir. 1966)." *United States v. Howard,* 432 F. 2d 1188, 1191 (9th Cir. 1970) (concurring opinion).

We find this approach useful. The Commonwealth in this case was prevented from putting into evidence expert testimony that it needed in order to meet its burden of proof. This was mainly due to the objections and arguments of appellant's counsel. In addition, the complexity of the problems presented by §13(a)(14) (especially the problem as to the allocation of the burden of proof, which we have here undertaken to resolve) added to the Commonwealth's difficulty in trying to convince the judge to allow the testimony. Thus the Commonwealth "cannot be faulted for the deficiency of proof which requires reversal." *United States v. Howard, supra* at 1191. In these circumstances, ordering a new trial is neither an abuse of our discretion, nor unfair to appellant.

To require appellant to stand trial again will not place him twice in jeopardy for the same offenses. In appealing his convictions to this court, appellant has asked either that his case be dismissed or that he be granted a new trial. A request for a new trial "opens the whole record for such disposition as might be just. See Bryan v. United States, 338 U.S. 552. And see Trono v. United States, 199 U.S. 521; Stroud v. United States, 251 U.S. 15, 18; Francis v. Resweber, 329 U.S. 459, 462." *Sapir v. United States,* 348 U.S. 373, 374 (1955) (DOUGLAS, J., concurring). Granting a new trial, therefore, does not offend the double jeopardy bar. *Bryan v. United States, supra* (new trial awarded after finding of insufficient evidence). *See also Commonwealth v. Thomas,* 448 Pa. 42, 292 A. 2d 352 (1972) (defendant's request for a new trial constitutes a waiver of double jeopardy).

The judgments of sentence are reversed and the matter is remanded for a new trial.