COURT OF APPEALS OF VIRGINIA


Present:    Judges Elder, Powell and Senior Judge Annunziata
Argued by teleconference


JON GOBLE, S/K/A
  JONATHON THOMAS GOBLE
                                                    OPINION BY
v.         Record No. 1976-09-3              JUDGE LARRY G. ELDER
                                               SEPTEMBER 14, 2010
COMMONWEALTH OF VIRGINIA


                 FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
                              Victor V. Ludwig, Judge

                 Dana R. Cormier (Dana R. Cormier, P.L.C., on brief), for
                 appellant.

                 Jennifer C. Williamson, Assistant Attorney General (Kenneth T.
                 Cuccinelli, II, Attorney General, on brief), for appellee.


        Jon Goble appeals his convictions for selling or offering to sell wild animal parts in

violation of Code § 29.1-553.  Goble argues that the trial court erred in exercising jurisdiction

because the sales of the wild animal parts occurred in Pennsylvania.  He further contends the

Commonwealth bore the burden of proving the sales did not fall under a statutory exception and

that if he, instead, bore the burden of proving application of a statutory exception as an

affirmative defense, he met that burden.  Finally, he contends the evidence failed to prove the

aggregate value of the sales was greater than $200, as required under the statutory enhancement

to punish him for a felony rather than a misdemeanor.  For the reasons that follow, we affirm

Goble's conviction and punishment for two misdemeanors and one felony.

I.

BACKGROUND

On September 22, 2008, Officer Neil T. Kester of the Virginia Department of Game and Inland Fisheries (the Department) executed a search warrant at Goble's residence. Officer Kester was searching for records and documents, including electronic transactions on Goble's computer, pertaining to violations of Code § 29.1-553, specifically, the sale of a mounted black bear. During the search, Goble's computer was seized, and Goble voluntarily logged onto the computer for the officers and provided them with his user name and password for eBay, an international online sale and auction site through which users buy and sell a variety of merchandise.

With the user name and password Goble provided, Officer Kester was able to access Goble's eBay account. Officer Kester recovered evidence of three eBay listings for mounted deer heads[1] that Goble had listed and sold. The listings showed that Goble had sold one deer head mount on June 30, 2008, for $450, one on July 11, 2008, for $432.27, and one on September 7, 2008, for $510. The listings also indicated that, at the time they were listed, the deer head mounts were located in Milford, Pennsylvania. It was undisputed that Goble received payment for the sales through an online account while in Virginia.

Goble was indicted on six counts of selling or attempting to sell a wild animal or part thereof in violation of Code § 29.1-553. On May 21, 2009, Goble waived his right to a jury trial and pleaded not guilty to the charges against him.

At trial, the Commonwealth offered evidence that Goble did not have a valid taxidermy permit at the time of the search. Officer Kester also testified that as to each of the first six items

---

[1] According to testimony elicited at trial, each mounted deer head consisted of a deer hide or hides sewn on a Styrofoam mold to resemble a deer head. Antlers were then attached to the form.

on the inventory return, all of which were antlers, Goble did not have a tag or check card confirming his possession of them was legal.[2] Kester testified it was the taxidermist's responsibility, when working with his own or a client's animal parts, to get either the check card, the check card number, or a confirmation number to confirm the legality of the possession.

Additionally, the trial court heard testimony from Mike Fies, a wildlife biologist and leader of the department's Furbear Project.[3] Fies testified that the term "fur-bearing animals" refers specifically to animals that are commonly trapped.[4]

After the Commonwealth rested its case, Goble took the stand in his own defense. He testified that he had a taxidermy permit from November 3, 2006, through July 31, 2007. He acknowledged that his permit was revoked after he pled guilty to illegally possessing a "road kill fawn." When he attempted to renew his permit, on November 28, 2007, the Department denied his application and informed him that he could not re-apply for a permit until August 2008. As a result of that letter, Goble claimed he "had a taxidermy permit" when he met with the Department's undercover officer on September 2, 2008, but he did not offer a copy of any such permit into evidence, and no evidence in the record shows that Goble ever obtained a new permit.

---

[2] The record established that a "tag" or "game check card" is an official certificate bearing a unique identifying number and containing the notation of a conservation police officer or other law enforcement officer confirming that the wild game or game part to which it is attached was obtained in a manner that complied with the law.

[3] According to Fies, the Furbear Project manages Virginia's wildlife populations and recommends the creation of trapping and hunting seasons as needed.

[4] Goble objected to this testimony, arguing that Fies was opining as to the legal definition of "fur-bearing animals." The trial court overruled the objection, stating that Fies was only reading Code § 29.1-100 which states, "'*Fur-bearing animals*' includes beaver, bobcat, fox, mink, muskrat, opossum, otter, raccoon, skunk, and weasel."

Regarding the mounted deer heads that were the subject of the prosecution, Goble provided three different accounts as to the origin of the deer hides he used to create them. He first testified that all three hides were "road kills" he had obtained from the police and that he had tags for all of them.[5] He then stated "[he] believe[d] that two of [the hides] were [from] road kills" and that he "legally harvested" the third, meaning that he obtained it while hunting legally in season. Finally, he changed his testimony again, stating that the hides had come from any one of three sources: a road kill for which he had a tag, a legal harvest, or a butcher shop. With regard to the antlers, Goble stated that he bought them from a "Big Game Show" in Pennsylvania and then said that he "believe[d]" he bought one of the sets of the antlers on eBay.

Goble admitted that he posted the three mounted deer heads for sale on eBay while he was in Virginia but stated that, at the time he made the postings, the mounted deer heads were located in Pennsylvania and were shipped from there, as well. Goble explained that he stored the mounts at his father's house in Pennsylvania because he did not have enough room to store all of his mounted deer heads in his basement in Virginia. Goble's sister indicated Goble did all of his taxidermy work in the basement of his Virginia residence.

At the close of all the evidence, Goble moved to strike, and the trial court denied the motion, reasoning as follows: "[E]ven if he was in lawful possession of the antlers, . . . he still sold deer antlers, and I can't find any authority for him to be able to do that."

After hearing all of the evidence, the trial court ruled as follows:

> Mr. Goble both offered to sell and sold those items on his front door step which was the Internet as it came into his house in Augusta County. And so it is the conclusion of the Court that, in fact, he sold those items from Augusta County. They may have been shipped from someplace else, but he sold them from Augusta

---

[5] Goble testified that he had "[p]robably 20" road kill tags in his pocket while he was testifying. However, he made no effort to produce any of those tags or introduce them into evidence, and he acknowledged that he could not match any of the tags to a specific deer or hide.

County. And on that basis, then, I find him guilty of . . . the three sales of deer.

The trial court subsequently determined that, because the aggregate of the three sales was greater than $200, Goble was guilty of one felony and two misdemeanors.[6]

Goble subsequently filed a motion to reconsider, arguing that he did not sell the antlers in Virginia and that, because the Commonwealth had failed to prove the value of the antlers alone was greater than $200, he was guilty, at most, of three misdemeanors. In a letter opinion of July 10, 2009, the trial court denied Goble's motion to reconsider. It expressly found Goble did not have a taxidermy license at the time of the June and July 2008 sales and that he failed to prove he had a license at the time of the September 2008 sale. It rejected Goble's claim that he did not sell the antlers in Virginia, noting that he listed the items for sale in Virginia and received payment in Virginia, regardless of where the items were shipped from, and holding that the act of *attempting* to sell was complete when Goble listed the items on eBay, "a marketing vehicle that surely reached a Virginia audience." Finally, it addressed Goble's claim that the Commonwealth failed to prove the value of the antlers, the only items it had ruled were illegally sold. It rejected the claim, first, because Goble never raised at trial the issue that the Commonwealth failed to prove the value of the antlers by themselves. Second, it concluded Goble's sales of the hides on the mounts were also illegal. It characterized the issue of whether the deer were "legally taken or not" as an affirmative defense rather than an element of the crime itself and found Goble had failed to meet his burden of proving the issue to a level sufficient to raise a reasonable doubt as to his guilt. As a result, it concluded, the value of each deer head mount, as a whole, was the proper value.

Goble noted this appeal.

---

[6] Of the original six counts, two were dropped prior to the start of the trial, and a third was struck after the trial court heard all of the evidence.

II.

ANALYSIS

A.

LOCATION OF THE SALES FOR THE PURPOSE OF DETERMINING JURISDICTION

Goble argues that because the sales of the mounted deer heads did not occur in the Commonwealth, the trial court erred in exercising jurisdiction. He contends the undisputed evidence demonstrates that the title to the mounted deer heads passed in Pennsylvania and, therefore, that the sales occurred in Pennsylvania. On that ground, he argues he cannot be convicted under Code § 29.1-553(A).[7] The Commonwealth, on the other hand, contends that the sales occurred in Virginia because Goble posted the mounted deer heads on eBay from his home and received payment in Virginia.

> When attempting to define terms in one part of the Code, courts
> should read a statute with "a view toward harmonizing it with
> other statutes. Because the Code of Virginia is one body of law,
> other Code sections using the same phraseology may be consulted
> in determining the meaning of a statute."

Marsh v. Commonwealth, 32 Va. App. 669, 677, 530 S.E.2d 425, 430 (2000) (quoting Branch v. Commonwealth, 14 Va. App. 836, 839, 419 S.E.2d 422, 425 (1992)).

Under Code § 8.2-106, a "sale" is defined as "the passing of title from the seller to the buyer for a price." The Code provides that "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to

---

[7] Code § 29.1-553(A) provides as follows:

> Any person who offers for sale, sells, offers to purchase, or
> purchases any wild bird or wild animal, or any part thereof, or any
> freshwater fish, except as provided by law, shall be guilty of a
> Class 1 misdemeanor. However, when the aggregate of such sales
> or purchases or any combination thereof, by any person totals
> $ 200 or more during any 90-day period, that person shall be guilty
> of a Class 6 felony.

the physical delivery of the goods . . . ." Code § 8.2-401(2). In the case of an auction, the Code

further provides that "[a] sale by auction is complete when the auctioneer so announces by the

fall of the hammer or in other customary manner." Code § 8.2-328; see 1-4 Corbin on Contracts

§ 4.14 (2010) (noting that when the auctioneer accepts the bid "in any mode that the bidder has

reason to know and understand . . . , the sale is consummated" and "[n]either party can

withdraw").

According to the traditional view of jurisdiction, "[a crime] must take place within this

State to give our courts jurisdiction. . . . Every crime to be punished in Virginia must be

committed in Virginia." Farewell v. Commonwealth, 167 Va. 475, 479, 189 S.E. 321, 323

(1937). In the present case, we need not decide whether title passed pursuant to Code § 8.2-328

or § 8.2-401 because the Commonwealth failed to prove either (1) in which state the auctioneer

announced the sale by the fall of the hammer or other customary means or (2) in which state

physical delivery of the mounted deer heads occurred. As such, we cannot conclude under the

traditional view of jurisdiction that "sale[s]" proscribed by Code § 29.1-553 occurred within the

Commonwealth.

The Commonwealth contends, however, that Virginia's courts have jurisdiction over

Goble's sales of the mounted deer heads because he made his eBay postings from his residence

in Virginia and received payment for those sales in Virginia. Our Supreme Court has recognized

an exception to the traditional view of jurisdiction, referred to as the "immediate result doctrine."

Travelers Health Ass'n v. Commonwealth, 188 Va. 877, 891, 51 S.E.2d 263, 268 (1949). When

our Supreme Court first adopted the immediate result doctrine, it explained as follows:

> "A question often arises as to the jurisdiction of a crime where the
> accused, while in one state, sets in motion a force which operates
> in another state, as where a shot is fired at a person across a state
> line or an injurious substance is sent to a person in another state
> with intent to injure him. In such cases the view has generally
> been taken that actual presence in a state is not necessary to make a

person amenable to its laws for a crime committed there; for if a crime is the immediate result of his act, he may be made to answer for it in its courts, although actually absent from the state at the time he does the act."

Id. (quoting 14 Am. Jur. Criminal Law § 227).

More recently, in Jaynes v. Commonwealth, 276 Va. 443, 666 S.E.2d 303 (2008), the Supreme Court applied the immediate result theory to conclude the Commonwealth had jurisdiction to prosecute a person for violating the Virginia Computer Crimes Act, Code §§ 18.2-152.1 through -152.15. Jaynes, from his home in North Carolina, sent unsolicited bulk e-mail, disguised with false routing and transmission information, to over 50,000 people who were subscribers of the internet service America Online, Inc. (AOL). 276 Va. at 448-50, 666 S.E.2d at 306. Although those e-mails originated outside the state, they passed through AOL's servers, which the evidence proved were located in Virginia. Id. Jaynes, citing Moreno v. Baskerville, 249 Va. 16, 452 S.E.2d 653 (1995), alleged "he had no control over the routing of the e-mails" and that AOL's method of routing was an intervening act. Jaynes, 276 Va. at 451-52, 666 S.E.2d at 306-07. He contended that "his actions did not have an 'immediate result' in Virginia" and that the Commonwealth lacked jurisdiction to prosecute him. Id.

In rejecting Jaynes' claim, the Supreme Court held the evidence established that "the location of AOL's servers [in Virginia] was information easily accessible to the general public" and that "all e-mail must flow through the recipient's e-mail server in order to reach the intended recipient." Id. at 451, 666 S.E.2d at 307. Thus, it concluded, "an intended and necessary result of Jaynes' action [in sending over 50,000 messages to e-mail addresses that ended 'in @aol.com'], the e-mail transmission through [AOL's] computer network, occurred in Virginia." Id. at 452-53, 666 S.E.2d at 307. Relying on its prior decision in Travelers Health, in which it cited Strassheim v. Daily, 221 U.S. 280, 284-85 (1911), our Supreme Court reiterated in Jaynes that "a state may exercise jurisdiction over criminal acts that are committed outside the state, but

are intended to, and do in fact, produce harm within the state." 276 Va. at 452, 666 S.E.2d at 307.

Our appellate courts have never held that a crime must *begin* with extraterritorial acts in order for the immediate result theory of jurisdiction to apply; our courts have held instead only that, if an act or acts committed outside the Commonwealth constitute key elements in the prosecution for the crime at issue, those extraterritorial acts, or the chain of events set in motion by them, must be the immediate cause of the harm the Commonwealth seeks to punish. See Moreno, 249 Va. at 19, 452 S.E.2d at 655 (distinguishing the immediate results doctrine where an intervening act occurred and therefore the facts were "entirely unlike a case in which a shot fired across a state line 'immediately' results in harm").

Our application of the immediate result doctrine in Gregory v. Commonwealth, 5 Va. App. 89, 360 S.E.2d 858 (1987), is instructive. In Gregory, the defendant, a Virginia resident and a long-distance tractor-trailer driver who routinely traveled outside the Commonwealth in the course of his employment, pledged his tractor as collateral for a loan he obtained from a Virginia bank. Id. at 90, 360 S.E.2d at 859. Pursuant to the security agreement Gregory entered into with the bank, Gregory agreed not to sell the property without the bank's written consent. Id. at 90-91, 360 S.E.2d at 859. Gregory fell behind on his loan payments, and while outside the Commonwealth on business, Gregory experienced mechanical difficulties with the tractor, lost his job, and sold the tractor without the bank's consent. Id. The trial court convicted Gregory for unlawfully disposing of property upon which there was a lien without the written consent of the lienor, defined in Code § 18.2-115 as larceny.[8] Id. at 90, 91, 360 S.E.2d at

---

[8] The statute also proscribed removing secured property from the Commonwealth, and Gregory was indicted for violating that portion of the statute, as well. However, "[b]ecause of the nature of Gregory's business, . . . it [was] conceded that the bank did not expect and did not request notification when on routine trips Gregory removed this property out-of-state." Gregory, 5 Va. App. at 91, 360 S.E.2d at 859.

859, 860. In doing so, the court expressly found Gregory formed the intent to sell the tractor while outside the Commonwealth, a finding that was supported by the evidence. Id. at 92, 360 S.E.2d at 860.

On review, we concluded the statute defining the crime did not require proof that "the fraudulent intent to dispose or the actual disposal of the secured property occurred within the boundaries of Virginia." Id. at 93, 360 S.E.2d at 860. We also rejected Gregory's contention that Virginia lacked jurisdiction to prosecute him for the crime. Id. at 93, 360 S.E.2d at 861. We noted that "the lien was created and the failure to obtain the bank's consent to the disposal of its collateral both occurred in [the Commonwealth]" and that "[o]nly the formation of the intent to deprive the bank of its collateral and the actual disposal of the tractor occurred outside [the Commonwealth]." Id. We agreed with the Commonwealth's observation that the statute was intended to prevent both "the economic injury caused to the secured party by Gregory's actions and the infringement of the lien created in Virginia." Id. at 93-94, 360 S.E.2d at 861. Relying on the Supreme Court's decision in Travelers Health, we concluded that "harm [was] caused in Virginia by Gregory's criminal acts *partially* committed within [the] Commonwealth" and that, under the immediate result doctrine, "such acts can be prosecuted here." Id. at 94, 360 S.E.2d at 861 (emphasis added).

In Goble's case, the right of Virginia to prosecute the offenses under the immediate result theory is even stronger than in Gregory. Goble *started* the sequence of events culminating in the illegal sales *inside* the Commonwealth rather than outside it, both by formulating the intent to sell the deer mounts at issue while in the Commonwealth and also by posting them for sale on eBay while in the Commonwealth. An additional component of the sales also occurred here, where Goble received payment for the deer mounts through an online account. The record does not indicate an intervening act of any sort took place. Although Virginia's loss was to its right to

control the sale of its natural resources without proof of legitimate possession and this loss was somewhat less tangible than the financial harm suffered by the bank in Gregory, this difference in the *nature* of the harm did not render the harm any less immediate or direct than in Gregory. Just as the lienholder in Gregory had a contractual right not to have the property in which it had a security interest disposed of without its permission, the Commonwealth, which has the duty to safeguard its resources for all Virginians, has a legitimate interest in preventing its deer and deer parts from being sold in a manner that violates Virginia statutes and regulations.

Accordingly, we conclude the trial court had jurisdiction to convict Goble of the charged offenses.

B.

THE STATUTORY EXCEPTIONS:  ELEMENT VERSUS AFFIRMATIVE DEFENSE

Goble next argues that the Commonwealth failed to prove his sales of the mounted deer heads did not fall into an exception provided by law.  Specifically, Goble contends that the phrase "except as provided by law," as used in Code § 29.1-553, see supra note 7, is a negative element of the offense that the Commonwealth must disprove.  The Commonwealth, on the other hand, argues that the phrase merely provides a statutory defense that Goble failed to prove.  We agree with the Commonwealth.

It is well established that, "[w]hen the sufficiency of the evidence is challenged on appeal, we determine whether the evidence, viewed in the light most favorable to the prevailing party, the Commonwealth, and the reasonable inferences fairly deducible from that evidence support each and every element of the charged offense." Haskins v. Commonwealth, 31 Va. App. 145, 149-50, 521 S.E.2d 777, 779 (1999).  "[W]hen we consider the sufficiency of the evidence we do not consider each piece of evidence in isolation.  Instead, we review the totality of the evidence to determine whether it was sufficient to prove an offense." Bowling v.

Commonwealth, 51 Va. App. 102, 107, 654 S.E.2d 354, 356 (2007).  "The judgment of the trial court is presumed to be correct and will be reversed only upon a showing that it is 'plainly wrong or without evidence to support it.'"  Id. (quoting Code § 8.01-680).  Thus, "[t]he issue upon appellate review is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Furthermore, "[p]enal statutes are to be strictly construed against the Commonwealth and in favor of the citizen's liberty."  Martin v. Commonwealth, 224 Va. 298, 300, 295 S.E.2d 890, 892 (1982).  "However, when statutory construction is required, we construe a statute to promote the end for which it was enacted, if such an interpretation can reasonably be made from the language used."  Mayhew v. Commonwealth, 20 Va. App. 484, 489, 458 S.E.2d 305, 307 (1995).

> When construing penal statutes which contain qualifications, exceptions or exemptions to their application, the limiting language may be viewed as a negative element of the offense which the prosecution must disprove.  Alternately, the court may determine that the exemption is a statutory defense, which the accused can assert to defeat the prima facie case of the prosecution.
>
> In determining whether specific limiting language is an element of the offense or a statutory defense, a court should look both to the intent of the statute as a whole and the ability of the respective parties to assert the existence or absence of the underlying facts sustaining the applicability of the limitation.

Id. at 489-90, 458 S.E.2d at 307-08 (citations omitted).

When determining whether the limiting language is a negative element or a statutory defense, this Court has identified four factors to be considered:

> "the wording of the exception and its role in relation to the other words in the statute; whether in light of the situation prompting legislative action, the exception is essential to complete the general prohibition intended; whether the exception makes an excuse or justification for what would otherwise be criminal conduct, i.e.,

sets forth an affirmative defense; and whether the matter is peculiarly within the knowledge of the defendant."

Id. at 490, 458 S.E.2d at 308 (quoting Commonwealth v. Stoffan, 323 A.2d 318, 324 (Pa. Super. Ct. 1974)).

An application of these factors to the present case demonstrates that the phrase "except as provided by law," as used in Code § 29.1-553, establishes a statutory defense as opposed to a negative element.

It is clear that the exception is not part of the definition of the prohibited conduct defined in Code § 29.1-553. A plain reading of the statute demonstrates that the prohibited conduct is offering for sale, selling, offering to purchase, or purchasing "any wild bird or wild animal, or any part thereof, or any freshwater fish." Code § 29.1-553. Significantly, the exception is referenced after the elements of the crime are defined and is not "essential to complete the general prohibition intended." Mayhew, 20 Va. App. at 490, 458 S.E.2d at 308.

Although the exception contained in Code § 29.1-553 does not create "an excuse or justification for what would otherwise be criminal conduct," Mayhew, 20 Va. App. at 490, 458 S.E.2d at 308, we do not believe this to be dispositive, as a number of situations exist in which wild animal parts may be sold legally. For instance, Code § 29.1-553(D) specifically provides an exception for "licensed Virginia auctioneer[s] or licensed auction firm[s]"; similarly, statutory exceptions exist for non-profit organizations, see Code § 29.1-521(A)(11), and American Indians, see Code § 29.1-521(B). Finally, it is readily apparent that the facts needed to establish these exceptions are necessarily and "peculiarly within the knowledge of the defendant." The Commonwealth would not, generally, be privy to the evidence required to establish these exceptions. Accordingly, we hold that the exception provided in Code § 29.1-553 is a statutory defense rather than an element of the crime.

C.

APPLICATION OF CLAIMED STATUTORY EXCEPTIONS

Goble argues that, even if the exception is a statutory defense, the evidence he presented at trial demonstrates that his actions fell within an exception provided by law. Specifically, Goble contends the sales were authorized because (1) he was a licensed taxidermist authorized to sell unclaimed mounted animals, see 4 VAC 15-40-270; (2) deer are "fur-bearing" animals, rendering the sales lawful under Code § 29.1-536; (3) the deer hides he sold were from legally taken deer, see 4 VAC 15-90-280; and (4) the mounts constituted "implements" made from "legally harvested deer skeletal parts, including antlers," see Code § 29.1-521(10). We disagree.

### 1. Sale of Unclaimed Mounted Animals

Under 4 VAC 15-40-270, a Virginia licensed taxidermist may sell "[u]nclaimed mounted native wildlife specimens or their processed hides, when taken in accordance with the provisions of law and regulations." However, the trial court found Goble did not possess a valid permit when the sales occurred in 2008, and the evidence, viewed in the light most favorable to the Commonwealth, supports that finding. Goble produced an expired taxidermy permit for 2007 and failed to produce any evidence that he possessed a valid permit for 2008 when the sales occurred. Indeed, the evidence indicates that the Department denied Goble's request to renew his permit on November 28, 2007, and informed him that he would not be eligible to re-apply for a permit until August 2008. Additionally, Goble presented no evidence that the mounted deer heads were unclaimed. Indeed, Goble's own testimony established that none of the deer used to create the mounts were unclaimed; rather, he testified that the deer were "road kills," legally harvested by him, or acquired from a butcher. Thus, the exception in 4 VAC 15-40-270 does not apply.

## 2. Sale of Certain Parts of "Fur-Bearing Animals"

Code § 29.1-536 allows for the sale of "the hides, furs or pelts of fur-bearing animals legally taken and possessed, and the carcass of any fur-bearing animal," so long as the sale is "in accordance with §§ 29.1-400 through 29.1-407." Code § 29.1-400 prohibits buying, selling exchanging, trafficking or trading in, bargaining for, soliciting for purchase, or possessing "the hides, furs or pelts of wild animals, or otherwise deal[ing] in fur as a business, without having first obtained a permit, subject to the exemptions of Code § 29.1-401." Code § 29.1-401(A) states that "[a] permit shall not be required of any hunter or trapper to possess or dispose of the hides, furs or pelts of wild animals legally shot or caught by him . . . ." Thus, it is clear that the interaction among Code §§ 29.1-536, -400, and -401(A) provides several exceptions to Code § 29.1-553.

Assuming, *arguendo*, that deer are fur-bearing animals, we hold Goble failed to prove his conduct fell within any of these exceptions. First, Code § 29.1-400 authorized Goble to sell the mounted deer heads only if he had a fur permit. Goble made no claim that he had a valid fur permit, and the evidence does not support such a conclusion.

Alternatively, under Code § 29.1-401(A), Goble could sell the mounted deer heads without a permit if he legally shot or caught the deer. At trial, Goble inconsistently claimed that a majority of the deer were either from road kills or a butcher. Although Goble also claimed at one point that he legally harvested one of the deer, the trial court was not required to credit this conflicting, self-serving testimony. See Haskins v. Commonwealth, 44 Va. App. 1, 10, 602 S.E.2d 402, 406 (2004) (recognizing that the trial court may disbelieve the defendant's self-serving explanation as "lying to conceal his guilt"). Thus, the evidence supports a finding that Goble failed to prove he legally shot or caught the deer that he used to make the mounted

deer heads and, therefore, that he cannot avail himself of the exception provided by Code § 29.1-536.

### 3. Sale of Hides from Legally Taken Deer

4 VAC 15-90-280 specifically provides that "[i]t shall be lawful to sell hides and hooves from any legally taken deer." Although Goble claimed he had the tags issued for the deer he used to make the mounted deer heads, he made no effort to produce those tags or introduce them into evidence. Additionally, he admitted that he could not actually match the tags with the deer used to make the mounted deer heads. Thus, Goble failed to prove that the deer used to make the mounts were "legally taken deer," as required to invoke the exception provided by 4 VAC 15-90-280.

In summary, not only did Goble fail to prove he had a permit that allowed him to sell the mounts or that he legally shot or caught the deer, he also failed to produce road kill tags to show he was in legal possession of the mounted deer heads.

### 4. Sale of "Implements" Made From Antlers

With regard to the antlers, Goble argues that his sale of the deer antlers was legal under Code § 29.1-521(10)(ii). Code § 29.1-521(10) states, in relevant part, that "the provisions of [Code § 29.1-521] shall not be construed to prohibit . . . (ii) the manufacture or sale of implements, including, but not limited to, tools or utensils, made from legally harvested deer skeletal parts, including antlers." Goble was charged under Code § 29.1-553, and not Code § 29.1-521. Thus, any exception provided by Code § 29.1-521 is irrelevant to the present case.

### D.

### VALUE

Goble contends the evidence failed to prove the value of the antlers by themselves and, thus, that if the evidence was insufficient to prove the sale of the hides was against the law, his

felony conviction cannot stand because violation of Code § 29.1-553 is a felony only if aggregate sales total more than $200 over any 90-day period.  Because the evidence supports the trial court's finding that Goble lacked statutory or regulatory authority to sell both the hides and the antlers comprising the deer mounts and also establishes the value of each mount as a whole, the lack of evidence of the value of each set of antlers does not require reversal of any of Goble's convictions.

III.

For the foregoing reasons, we affirm Goble's convictions.

<u>Affirmed.</u>

Powell, J., dissenting.

I respectfully dissent from the portion of this opinion affirming Goble's felony conviction by holding that the "immediate result doctrine" provides Virginia courts with jurisdiction over Goble's sale of the mounted deer heads stored in Pennsylvania. Under the immediate result doctrine, "a state may exercise jurisdiction over criminal acts that are committed outside the state, but are intended to, and do in fact, *produce harm within the state*." Jaynes v. Commonwealth, 276 Va. 443, 452, 666 S.E.2d 303, 307 (2008) (emphasis added). Thus, the immediate result doctrine extends "jurisdiction to prosecute an offense not fully executed in Virginia but resulting in *immediate harm* within the Commonwealth." Foster-Zahid v. Commonwealth, 23 Va. App. 430, 440, 477 S.E.2d 759, 764 (1996) (emphasis added); see also Gregory v. Commonwealth, 5 Va. App. 89, 94, 360 S.E.2d 858, 861 (1987) ("Where harm is caused in Virginia by criminal acts partially committed within this Commonwealth, such acts can be prosecuted here.").

Implicit within the immediate results doctrine is the requirement that the harm the Commonwealth seeks to punish must immediately result from the extraterritorial criminal act or from the chain of events set into motion by the act. See Travelers Health Ass'n v. Commonwealth, 188 Va. 877, 892, 51 S.E.2d 263, 269 (1949) ("'It has long been a commonplace of criminal liability that a person may be charged in the place *where the evil results*, though he is beyond the jurisdiction when he starts the train of events *of which the evil is the fruit*.'" (quoting Strassheim v. Daily, 221 U.S. 280, 284-85 (1911)) (emphasis added)).

The sequence of events is critical to the proper application of the immediate results doctrine. In its various explanations of the immediate results doctrine, our Supreme Court has repeatedly used the example of a shot fired across state lines. See, e.g., id. at 891, 51 S.E.2d at 268 (Adopting the immediate results doctrine in situations "where the accused, while in one

state, sets in motion a force which operates in another state, as where a shot is fired at a person across a state line."); see also Moreno v. Baskerville, 249 Va. 16, 19, 452 S.E.2d 653, 655 (1995) (distinguishing the immediate results doctrine where an intervening act occurred and therefore the facts were "entirely unlike a case in which a shot fired across a state line 'immediately' results in harm"). Similarly, in each of the cases cited by the majority, a criminal act was perpetrated which *resulted* in a harm. None of those cases reflect the facts of this case where the harm sought to be prevented, i.e. violation of Virginia's interest in protecting its wildlife from illegal taking, occurred *before* the criminal act that is being prosecuted. See Jaynes, 276 Va. 443, 666 S.E.2d 303 (sending bulk e-mail with false routing information from North Carolina results in illegal use of a Virginia-based e-mail provider's computer network); Travelers Health Ass'n, 188 Va. at 892, 51 S.E.2d at 269 (selling insurance without the required permits results in economic loss in Virginia); Foster-Zahid, 23 Va. App. at 430, 477 S.E.2d at 759 (child withheld outside Virginia results in harm to relationship with father in Virginia); Gregory, 5 Va. App. at 89, 360 S.E.2d at 858 (illegal conversion of property outside of Virginia results in economic injury in Virginia). All of these cases make it clear that a proper application of the immediate results doctrine is dependent on a criminal act preceding the resulting harm in Virginia. The doctrine does not, by its terms, apply to a set of facts where the harm, which has already occurred, provides the fodder for the subsequent criminal act. Thus, absent a showing of the immediate harm resulting from the criminal act, Virginia does not have jurisdiction.

In the present case, the extraterritorial criminal act was the sale of the mounted deer heads. According to the majority, the harm was "Virginia's loss . . . to its right to control the sale of its natural resources without proof of legitimate possession." Even if this is the harm sought to be prevented, in reaching this conclusion the majority ignores the fact that the "loss" occurred as soon as the mounted deer heads were removed from the state, and therefore

necessarily preceded the extraterritorial act.  As nothing in the Code criminalizes the transfer of wild animal parts to another state, I find that the Commonwealth has failed to demonstrate what harm, if any, occurred in Virginia *as an immediate result* of Goble's sales of mounted deer heads stored in Pennsylvania.  See, e.g., United States v. Dove, 247 F.3d 152, 156 (2001) (recognizing that Code § 29.1-553 "prohibits the sale of [wild animal parts], but not their transportation or possession").

Furthermore, I believe the majority misidentifies the harm sought to be protected.  As it is the duty of the Department to "[e]nforce or cause to be enforced all laws for the *protection, propagation and preservation* of game birds and game animals of the Commonwealth," Code § 29.1-109 (emphasis added), it is my belief that the harm the Commonwealth is seeking to prevent is injury to its wildlife through illegal taking, i.e. poaching.  See also 4 VAC 15-40-270 (allowing a licensed taxidermist to sell "[u]nclaimed mounted native wildlife specimens or their processed hides, *when taken in accordance with the provisions of law and regulations*" (emphasis added)).  Clearly the illegal taking in the present case occurred well before the sale and in no way could be considered a result of the subsequent sale.

Although I find that Virginia does not have jurisdiction to prosecute Goble for the *sales* of the mounted deer heads, it cannot be overlooked that Goble was tried on the theory that he both offered to sell and sold wild animal parts in violation of Code § 29.1-553.  This Court has previously recognized that, "[a]n appellate court may affirm the judgment of a trial court when it has reached the right result for the wrong reason." Driscoll v. Commonwealth, 14 Va. App. 449, 451-52, 417 S.E.2d 312, 313 (1992).  In applying this rationale, this Court is limited to those situations where the correct reason for affirming the trial court was raised at trial and no further factual resolution is needed. Id. at 452, 417 S.E.2d at 313-14.  At trial, the Commonwealth specifically argued that Goble both offered to sell and sold the mounted deer heads.  Indeed,

Goble acknowledges these facts in his brief. Further, it is clear that the trial court found that Goble had both sold and *offered to sell* the mounted deer heads in violation of Code § 29.1-553. As such, no further factual resolution is needed. Therefore, I find that this Court must examine whether Goble could properly be convicted of offering to sell the mounted deer heads in violation of Code § 29.1-553.

Goble concedes that he was in Virginia when he posted the mounted deer heads on eBay, therefore jurisdiction is not at issue. Rather, Goble argues that Code § 29.1-553 only prohibits offers for sale where the completed sale would be illegal. Specifically, Goble contends that, because the actual sales did not occur in Virginia, he cannot be convicted of the corresponding offers for sale. I disagree.

In Lynch v. Commonwealth, 131 Va. 769, 771, 109 S.E. 418, 419 (1921), our Supreme Court explained that "[t]he offer to sell . . . is complete the moment it is made, and in no way depends for its existence upon the present or future ability of the person making the offer to complete the sale in accordance with the offer." As such, "[a]n offer to sell is one thing. A completed sale is another and different thing." Id. at 772, 109 S.E. at 419.

The record clearly demonstrates that Goble was in Virginia when he offered the mounted deer heads for sale by posting them on eBay. The crime of offering the mounted deer heads for sale was complete at that moment; that the mounted deer heads were not actually sold in Virginia is thus of no relevance to the determination of the place where the offer for sale occurred. Accordingly, there is sufficient evidence to support Goble's misdemeanor convictions on the basis that he offered for sale three mounted deer heads in violation of Code § 29.1-553.

Regarding Goble's felony conviction, however, the sentence enhancement provision found in Code § 29.1-553(A) only applies where "the aggregate of such sales or purchases or any combination thereof, by any person totals $ 200 or more during any 90-day period"; the statute

makes no mention of sentence enhancement for "offers for sale" or "offers for purchase." Accordingly, punishment as a Class 1 misdemeanor is the maximum punishment to be imposed upon conviction of offering wild animals or wild animal parts for sale in violation of Code § 29.1-553(A).  Therefore, I would vacate Goble's felony conviction, and remand the matter to the trial court for re-sentencing as a Class 1 misdemeanor.  See Rufty v. Commonwealth, 221 Va. 836, 839, 275 S.E.2d 584, 586 (1981) (vacating the defendant's sentence and remanding for re-sentencing where trial court erroneously applied a sentence enhancement).