629 A.2d 123

COMMONWEALTH of Pennsylvania

v.

Alice BARNES, Appellant.

COMMONWEALTH of Pennsylvania

v.

David BARNES, Appellant.

Superior Court of Pennsylvania.

Argued Jan. 7, 1993.

Filed July 22, 1993.

Dennis G. Kuftic, Edinboro, for appellant in Nos. 210 and 211.

Kenneth A. Zak, Asst. Dist. Atty., Erie, for Com., appellee.

Before ROWLEY, President Judge, and JOHNSON and MONTGOMERY, JJ.

ROWLEY, President Judge:

These consolidated appeals of Alice Barnes and David Barnes, husband and wife, are taken from the judgments of sentence imposed following their conviction on seven counts of

cruelty to animals, 18 Pa.C.S. § 5511(c). Appellants, who ask that the judgments of sentence be vacated and that they be discharged, raise the following issues:

1) Did the trial court err in failing to find that the grant of police power to private corporations such as the Erie Humane Society was an improper delegation of governmental authority and that the search warrants and citations obtained pursuant to that authority were therefore illegal, requiring suppression of the evidence and quashal of the citations?

2) Did the trial court err in failing to find that 18 Pa.C.S. § 5511(c) is unconstitutionally vague and violates due process, as it failed to place appellants on notice that their conduct of neglecting unwanted horses did not fall within the exception for "activity undertaken in normal agricultural operation"?

3) Was the evidence insufficient to sustain appellants' convictions, where the Commonwealth failed to offer evidence in its case in chief that appellants' conduct was not "activity undertaken in normal agricultural operation" and failed to rebut evidence offered by appellants that their conduct did in fact constitute such activity?

The events leading up to appellants' convictions began in May of 1991, when David Philipe, an environmental inspector with the Erie County Health Department, went to appellants' horse farm, Barnes' Yard Arabians, to investigate a complaint concerning odors emanating from the farm. Arriving at the farm, where no one was at home, he noticed a strong odor of dead or rotting animals. Mr. Philipe walked around the farm and saw the carcasses of dead animals, including two horses. Looking into the barns, he saw several horses that appeared to be undernourished and poorly groomed. Mr. Philipe notified Dr. Barnes of his violation of Health Department regulations and reported his findings to Merle Wolfgang, chief cruelty officer of the Erie Humane Society.

Ms. Wolfgang went to appellants' farm the day after Mr. Philipe's visit there and found conditions to be as he had described them. When she returned several days later with the aim of obtaining appellants' consent to search the proper-

ty, appellants informed her that they had given the horses away. After leaving appellants' property, Ms. Wolfgang saw a number of apparently ill horses in a nearby field and learned from the owner of that property that the horses belonged to appellants, who were renting the field. On the basis of her own affidavit, Ms. Wolfgang then secured a search warrant, which she executed with the assistance of other Humane Society agents and state police officers. Seven horses were taken from the rented field, and subsequent examination by a farrier and a veterinarian revealed that all of these horses were suffering from numerous, severe, and chronic health problems.

Appellants were found guilty before a district justice of ten counts of cruelty to animals. Following sentencing, they appealed to the Court of Common Pleas of Erie County, where they were convicted, following a non-jury trial de novo, of seven counts of the same offense. After their post-verdict motions were denied, Alice Barnes was sentenced to concurrent terms of imprisonment of thirty days on each of the seven counts and to forfeiture of the seven horses involved, and David Barnes was sentenced to concurrent terms of imprisonment of ninety days on each count, forfeiture of the horses, and a $300.00 fine. These timely appeals followed.

Appellants' first issue concerns the following provisions of the cruelty to animals statute, 18 Pa.C.S. § 5511:

(i) **Power to initiate criminal proceedings.**—An agent of any society or association for the prevention of cruelty to animals, incorporated under the laws of the Commonwealth, shall have the same powers to initiate criminal proceedings provided for police officers by the Pennsylvania Rules of Criminal Procedure. An agent of any society or association for the prevention of cruelty to animals, incorporated under the laws of this Commonwealth, shall have standing to request any court of competent jurisdiction to enjoin any violation of this section.

. . . . .

**(1) Search warrants.**—Where a violation of this section is alleged, any issuing authority may, in compliance with the applicable provisions of the Pennsylvania Rules of Criminal Procedure, issue to any police officer or any agent of any society or association for the prevention of cruelty to animals duly incorporated under the laws of this Commonwealth a search warrant authorizing the search of any building or any enclosure in which any violation of this section is occurring or has occurred, and authorizing the seizure of evidence of the violation including, but not limited to, the animals which were the subject of the violation. . . .

. . . . .

**(m) Forfeiture.**—In addition to any other penalty provided by law, the authority imposing sentence upon a conviction for any violation of this section may order the forfeiture or surrender of any abused, neglected or deprived animal of the defendant to any society or association for the prevention of cruelty to animals duly incorporated under the laws of this Commonwealth.

18 Pa.C.S. § 5511(i, *l*, m).

■ Appellants assert that these provisions are an unconstitutional delegation of governmental authority, violative of the Fourth Amendment to the United States Constitution and of several provisions of the Pennsylvania Constitution, namely, Article I, Section XV (special criminal tribunals); Article II, Section I (legislative power); Article III, Section XXXI (delegation of certain powers prohibited); Article IV, Section II (duties of governor); and Article V, Section X(c) (concerning the power of the Supreme Court to prescribe general rules of judicial administration). In effect, appellants argue, the provisions quoted above

allow[ ] the creation of "vigilante" groups—private individuals who are vested with authority to criminally arrest and prosecute the very citizens to whom they are philosophically opposed—which exceeds the power of the legislature and is contrary to the most basic notions of criminal justice.

Brief for Appellants at 13. In considering the specific arguments made by appellants in support of their claim, we are mindful that

> appellant[s] carr[y] a heavy burden of persuasion. A legislative enactment enjoys a strong presumption in favor of constitutionality and will not be invalidated unless it clearly, palpably, and plainly violates the Constitution. In determining the legislature's intent in writing the statute at issue, we presume that the legislature did not intend to violate the state or federal Constitution. All doubts must be resolved in favor of a finding of constitutionality.

*Jenkins v. Hospital of the Medical College of Pennsylvania,* 401 Pa.Super. 604, 616, 585 A.2d 1091 (1991) (en banc), *alloc. granted,* 529 Pa. 669, 605 A.2d 334 (1992) (citations omitted).

■ Appellants contend, first, that delegating to the Erie Humane Society the powers enumerated above violates both the grant of executive power to the governor to enforce the criminal laws, set forth in Article IV, Section II of the state Constitution, and the prohibition, contained in Article III, Section XXXI, against the delegation by the legislature of municipal powers to a private corporation. In support of this contention, appellants cite two appellate cases, *Kellerman v. City of Philadelphia,* 139 Pa.Super. 569, 13 A.2d 84 (1940), and *Wilson v. School District of Philadelphia,* 328 Pa. 225, 195 A. 90 (1938).

At issue in *Kellerman* was the constitutionality of a statutory provision giving to the Director of Public Health of the City of Philadelphia the power to issue permits allowing barbershops to operate beyond prescribed hours when, in the Director's opinion, public necessity required the granting of such permits. This Court upheld the trial court's decree enjoining the enforcement of the provision. Such a delegation did not violate the Constitution, the Court explained, if "the actual enforcement of the law was controlled by a standard ... in some degree extraneous to and independent of the mind and judgment of the enforcing officer." 139 Pa.Super. at 575, 13 A.2d at 86. In the case before the Court, there was no such extraneous standard; rather, the legislature had vested in the

Director of Public Health sole discretion to determine the meaning of the term "public necessity." For that reason, this Court held that the challenged provision was an unconstitutional delegation of legislative power.

A similar result was reached in *Wilson*, where the School District of Philadelphia appealed the trial court's decree that the Board of Public Education be restrained from levying certain taxes for school purposes. Because the legislature had not enacted a tax rate, but had empowered the Board to establish a rate, this Court concluded that the legislation in question was an unconstitutional delegation of the taxing power to an appointive board.

In both of the cited cases, the concern of this Court was with the delegation of legislative power to an official or group of officials whose decisions would not be guided by any standard "extraneous to or independent of" their own judgment. The case before us does not present such a situation. The power of agents of the Erie Humane Society to initiate criminal proceedings under 18 Pa.C.S. § 5511(i) is circumscribed by the Rules of Criminal Procedure. Section 5511(1) authorizes "any issuing authority" to issue search warrants to agents of the Society, but only "in compliance with the applicable provisions of the Pennsylvania Rules of Criminal Procedure." It is "the authority imposing sentence," not the Humane Society or its agents, who is empowered by § 5511(m) to order the forfeiture or surrender of an abused animal to the Society.

In none of these situations do agents of the Erie Humane Society operate as "vigilantes," unconstrained by any external standards. To the contrary, their actions are regulated by the Rules of Criminal Procedure, by the probable cause requirement for the issuance of search warrants, and by the added constraints of case law. Therefore, the cases relied upon by appellants do not persuade us that the challenged provisions effect an unconstitutional delegation of legislative or executive power.

■ Next, appellants argue that "the determination by the General Assembly that an S.P.C.A. agent may act as a police officer under [Pa.R.Crim.P.] 101 [concerning the means of instituting proceedings in court cases] appears to be an improper usurpation of the rule-making authority given to the Pennsylvania judicial branch under Article V, Section 10(c) of the Pennsylvania Constitution" (Brief for Appellant at 16). To support this argument, appellants cite *Kremer v. State Ethics Commission,* 503 Pa. 358, 469 A.2d 593 (1983), and *Commonwealth v. Dumont,* 370 Pa.Super. 155, 536 A.2d 342 (1987), *alloc. denied,* 519 Pa. 659, 546 A.2d 620 (1988).

In *Kremer* the Supreme Court considered whether the financial disclosure requirement of the state Ethics Act was intended or should be interpreted to apply to judges. The Court concluded that the challenged provision was unconstitutional as applied because it was an infringement by the legislature upon the power of the judiciary, a co-equal branch of government, to supervise the courts.

In *Dumont,* which involved the seizure of video poker machines pursuant to search warrants issued by police magistrates of the city of Pittsburgh, this Court considered appellants' claim that because 42 Pa.C.S. § 1143(a)(1), which sets forth the jurisdiction of the Pittsburgh Magistrate Court, does not specifically authorize Pittsburgh magistrates to issue search warrants, the magistrates have no power to do so. In the course of its decision upholding the magistrates' authority to issue search warrants, this Court concluded that "the issuance of a search warrant involves a matter of procedure and is, therefore, subject to the rule making power of the Supreme Court, who may, in the exercise of that power, authorize the issuance of a search warrant where the statute in question has not by clear and express language done so." 370 Pa.Super. at 166, 536 A.2d at 347.

Neither of these opinions speaks directly to the issue at hand, and appellants do not offer any detailed explanation of their relevance. Moreover, appellants' argument fails to take into account the fact that in the definitions provision of the Rules of Criminal Procedure, Pa.R.Crim.P. 3(*o*), "police offi-

cer" is defined as "any person who is *by law* given the power to arrest when acting within the scope of the person's employment" (emphasis added). Accordingly, we conclude that this claim is without merit.[1]

 Appellants contend further that "the investment of authority in untrained private agents also appears to be inconsistent with the requirement in both federal and state Constitutional law that all searches and seizures be 'reasonable' " (Brief for Appellants at 17). Appellants note that Humane Society agents are not required to take an oath, to undergo formal police training, or to learn the Rules of Criminal Procedure. We decline to hold that these omissions render each and every search conducted by such an agent "unreasonable." Rather, the reasonableness of searches conducted by Humane Society agents, like those conducted by police officers, is a matter to be decided on a case-by-case basis.

Finally, appellants assert that the dangers inherent in authorizing Humane Society agents to search and arrest are magnified because they are shielded from liability by the "good Samaritan" statute, 42 Pa.C.S. § 8332.2(a).[2] Appellees

---

1. Similarly, while appellants contend that under Pa.R.Crim.P. 52 only "law enforcement officers" may file citations, Pa.R.Crim.P. 3(1) defines "law enforcement officer" as "any person. who is *by law* given the power to enforce the law when acting within the scope of that person's employment" (emphasis added). As explained in the Comment to Rule 52, "[i]t is intended that a wide variety of officials will have the authority to issue citations and shall do so as provided in these rules."

2. The statute reads as follows:

(a) **General rule.**—Except as provided otherwise in this section, no person who serves without compensation, other than reimbursement for actual expenses, as an officer, director or trustee of any nonprofit organization under section 501(c)(3) of the Internal Revenue Code of 1954 (68A Stat. 3, 26 U.S.C. § 501(c)(3)) shall be liable for any civil damages as a result of any acts or omissions relating solely to the performance of his duties as an officer, director or trustee, unless the conduct of the person falls substantially below the standards generally practiced and accepted in like circumstances by similar persons performing the same or similar duties, and unless it is shown that the person did an act or omitted the doing of an act which the person was under a recognized duty to another to do, knowing or having reason to know that the act or omission created a substantial risk of

point out, however, that the statute applies to persons who serve without compensation, not to paid employees such as the agents involved in the present case. In addition, subsection (b) of the statute provides that "[n]othing in this section shall be construed as affecting or modifying any existing legal basis for determining the liability, or any defense thereto, of any nonprofit association." 42 Pa.C.S. § 8332.2(b). We conclude, therefore, that this argument does not entitle appellants to relief.

█ In their second issue, appellants contend that the statutory provision under which they were convicted is unconstitutionally vague and therefore violates due process because it failed to place them on notice that their conduct did not fall within the exception provided for "activity undertaken in normal agricultural operations." Following is the statutory definition of the offense of which appellants were convicted:

> (c) **Cruelty to animals.**—A person commits a summary offense if he wantonly or cruelly illtreats, overloads, beats, otherwise abuses any animal, or neglects any animal as to which he has a duty of care, whether belonging to himself or otherwise, or abandons any animal, or deprives any animal of necessary sustenance, drink, shelter or veterinary care, or access to clean and sanitary shelter which will protect the animal against inclement weather and preserve the animal's body heat and keep it dry. This subsection shall not apply to activity undertaken in normal agricultural operation.

18 Pa.C.S. § 5511(c). The crucial phrase "normal agricultural operation" is defined as follows:

> Normal activities, practices and procedures that farmers adopt, use or engage in year after year in the production and preparation for market of poultry, livestock and their products in the production and harvesting of agricultural, agronomic, horticultural, silvicultural and aquicultural crops and commodities.

> actual harm to the person or property of another. It shall be insufficient to impose liability to establish only that the conduct of the person fell below ordinary standards of care.
> 42 Pa.C.S. § 8332.2(a).

18 Pa.C.S. § 5511(q). According to appellants, it is a normal practice in the horse farming business to neglect horses that are no longer wanted and are going to be sent to "killer pens" at the livestock auction and then sold for dog food.

It is the case, as appellants contend, that a statute is unconstitutionally vague if "it fails to provide reasonable notice of the conduct to the person charged with violating its prohibitions." *Commonwealth v. Gonzalez,* 403 Pa.Super. 157, 165, 588 A.2d 528, 532 (1991). If persons of common intelligence must necessarily guess at the meaning of the statute's terms and differ as to the statute's application, the statute will be held to be violative of due process. *Id.*

> However, the constitutional prohibition against vagueness does not invalidate every statute which could have been drafted with greater precision. Due process requires only that the law give sufficient warning so that individuals may conform their conduct so as to avoid that which the law forbids.

*Id.* at 166, 588 A.2d at 533 [citing *Commonwealth v. Westcott,* 362 Pa.Super. 176, 196, 523 A.2d 1140, 1149–50 (1987), *appeal denied,* 516 Pa. 640, 533 A.2d 712 (1987) ]. Where, as here, the case does not involve a claim that the statute is unconstitutional on its face because it infringes on First Amendment rights, we are required to measure the terms of the statute against the conduct engaged in by appellants. *Commonwealth v. Tavares,* 382 Pa.Super. 317, 324, 555 A.2d 199, 203 (1989).

Applying these principles to the case at bar, we conclude that the statute is not unconstitutionally vague. Although the term "[n]ormal" is not defined, we are instructed by the Statutory Construction Act, 1 Pa.C.S. § 1903, *see Commonwealth v. Tavares, supra,* to construe terms in accordance with their "common and approved usage." The dictionary defines "normal" as "conforming with or constituting an accepted standard, model, or pattern; ... natural; standard; regular." *Webster's New Universal Unabridged Dictionary,* 2d ed. (1983). That the exception for "activity undertaken in normal agricultural operation" applies only to routine and accepted

agricultural practices is further emphasized by the definition's reference to "activities ... engage[d] in *year after year* ..." (emphasis added). From these definitions, persons of common intelligence could be expected to conclude that appellants' utter neglect of their horses, as described above, would not fall within the purview of the exception. To insist that the statute provide a detailed list of particular activities that fall within the exception would, we think, be to demand the type of "greater precision" which our case law does not require. Accordingly, appellants' second claim is without merit.

■ In their third issue, appellants contend that the evidence was insufficient to support their convictions because the Commonwealth failed to prove beyond a reasonable doubt that their actions did not constitute "activity undertaken in normal agricultural operation." Central to appellants' argument is the assertion that their non-inclusion within this exception is a material element of the offense and that the burden of proving their non-inclusion beyond a reasonable doubt therefore falls upon the Commonwealth.

We disagree. In *Commonwealth v. Saccol*, 384 Pa.Super. 161, 557 A.2d 1095 (1989), this Court analyzed a similar burden-of-proof issue:

> When a statute defining an offense contains an exception, in the enacting clause, which is so incorporated with the language defining the offense that the ingredients of the offense cannot be accurately and clearly described if the exception is omitted, the rules of good pleading require that an indictment founded upon the statute must allege enough to show that the accused is not within the exception, but if the language of the clause defining the offense is so entirely separable from the exception that the ingredients constituting the offense may be accurately and clearly defined without any reference to the exception, the pleader may safely omit any such reference, as the matter contained in the exception is the matter of defense and must be shown by the accused.

*Id.* at 174, 557 A.2d at 1102 [quoting *Commonwealth v. Stoffan,* 228 Pa.Super. 127, 323 A.2d 318 (1974) ]. Applying this standard, we conclude that the "normal agricultural operation" exception contained in 18 Pa.C.S. § 5511(c) is entirely separable from the clause defining the offense and is therefore a "matter of defense." Under our case law, the burden is not upon the Commonwealth to prove a negative, i.e., that appellants do not fall within this exception. *Id.* at 174, 557 A.2d at 1100. Rather, "where the defendant comes forward with some evidence that he [fell within the exception], the burden shifts to the Commonwealth to prove [that he did not] beyond a reasonable doubt." *Id.* at 172, 557 A.2d at 1101.

With this understanding, we turn to the evidence offered at trial to determine whether it was sufficient to sustain appellants' convictions. A Commonwealth witness, Herbert Miller, testified that, as far as he knew, appellants "were in the market to sell registered horses" (N.T., 10/30/91, at 51). Carrie Morton, who was employed at Dr. Barnes' veterinary clinic, testified that appellants had several times discussed with her the market for horses and the possibility of selling them at a livestock sale in Herman, New York, where horses are sold "for private buying or for meat" (N.T., 10/30/91, at 26). However, they did not sell any horses there. Ms. Morton testified further that she was familiar with the livestock sale in question:

Q: ... Have you been able to observe any animals that appeared to be in the conditions of [appellants'] horses being sold there for meat?

A: Yes.

Q: Okay, and what—are they put in a pen called a killer pen?

A: Yes.

. . . . .

Q: For the purpose of being sold for meat?

A: Yes.

. . . . .

Q: Are they ... horses that people no longer want?

340

A: Right.

Q: Okay. Do they [generally] appear in the same condition as [appellants'] horses in terms of being neglected?

A: Yes.

Q: Are you familiar with any practice or procedure in the horse industry regarding the neglecting of horses for sale ... for meat ...?

A: Yes.

Q: What is that practice, ma'am?

A: Well, once they're—once you have decided not to keep a horse, you're not going to spend money on it. And number two, at the killer pen, they are neither fed nor watered until they are taken away.

Q: All right. Prior to getting—those horses getting there, though, is the practice—is there any practice of providing a medical—veterinarian care to them for feeding?

A: I don't think so.

Q: All right. Are they generally fed just water and hay and spend time in whatever condition they are—

A: Whatever it takes to get them to the pen.

N.T., 10/30/91, at 27–29. On cross-examination, Ms. Morton acknowledged that she was not familiar with the conditions under which appellants' horses had been kept, and that because the weight of the horse would be "a factor in how much the meat person pays" (N.T., 10/30/91, at 37) for the animal at the livestock sale, a seller would receive more money for a larger horse than for a smaller one. On redirect she testified as follows:

Q: ... Is it a common practice among the horsemen to feed ... these animals or care—feed these animals, well, for instance, if they're going to the pen?

A: Not in—any horse people that I knew that they made there [sic] living from gathering together killer horses, they did not care now [sic] they looked.

Q: These people that gather together these killer horses, they don't care now [sic] they look. Do you know what they normally feed them?

A: No.

Q: Okay. Would it be—did these horses ever appear to have been fed much at all?

A: Some of the horses that go to the killer pen appear fat.

Q: Okay.

A: Others of them are definitely not.

Q: Okay. Others appear like [appellants'] horses?

A: Yes.

N.T., 10/30/91, at 42.

Linda Reed, who had worked as a stable manager at the establishment where appellants' horses were taken by the Humane Society, testified for the defense as follows:

Q: Are you familiar with any common practice in the horse industry regarding the—essentially, what could be called the neglect and care of horses that are intended for sale as meat?

A: Yes.

Q: What is that practice?

A: If a person has an animal they no longer want and then intend to sell it for meat, the horse, essentially, isn't going to get care.

Q: Okay. No vet care or anything like that?

A: No.

Q: What about food?

A: Minimum amounts of food or are you speaking of at the killers or before?

Q: Well, yeah, even before.

A: If the person intends to take the horse to the killers, then [it] depends on what kind of meat they're intending to sell it for. If it's going to be dog food, a person isn't going to certainly put any money into the horse.

N.T., 10/30/91, at 48. According to Ms. Reed, the price for horses being sold for dog food was 47 or 48 cents a pound and that because of the depressed state of the market for Arabian horses, appellants' horses would have obtained the same price even if sold for other purposes. Ms. Reed also testified as follows:

Q: ... [A]re there any farms that you're aware of that like collect these animals for dog food?

A: I don't know of any farms locally. I know that there is—Ohio is supposed to have two meat packing plants.... Supposed to be a new one in Ohio. I don't know exactly where it is.

Q: The horses that are collected for sale there, are they— would they look similar to the conditions of [appellants'] horse that you saw?

A: It's possible, certainly.

Q: Okay. Once they're at these killer pens, okay, do you know how long they'll stay at these pens sometime?

A: It usually isn't a very long period. Occasionally you'll—there would be a horse that can stay there up to a month.

Q: Okay. And during this period of time, what kind of care do they get?

A: Minimal.

Q: And what's minimal?

A: Hay, water, just so the horse doesn't—

Q: Would they get any medical treatment at all?

A: No.

Q: Okay. Any hoof picking?

A: No.

Q: For that matter, any deworming or delousing?

A: No. The horse is there with the intent of being killed shortly.

N.T., 10/30/91, at 49–50. On cross-examination the witness testified as follows:

Q: ... [H]ave you ever gone to those pens, those killer pens?

A: No.

Q: Have you ever been there?

A: And I never want to.

Q: Okay. I'm sure of it. So, this is all based on what you picked up over the years?

A: Yes.

Q: All right. And as far as that aspect of this case, have you ever been involved with any aspect of horse farming in this area, which involved horses being basically not fed, basically left in the condition that you found these horses in, for a length of time prior to being taken to the killer pen?

A: No.

Q: Okay. So, normally from your understanding of the horse industry, that when a horse has decided to be basically sold for purposes of just slaughter for meat, that that period of not feeding, giving minimal or no care, begins once they are—that horse is put in that position—well, is committed ... to that position of being sold for meat?

A: I would have to say that there are instances where the horse arrives that way.

Q: Okay. All right, is that common?

A: No.

Q: Now, if a horse is just simply kept on a horse farm for purposes of breeding and sale, whatnot, just a horse farm—

A: Uh-huh.

Q: —the horses that you found in this case, was that typical of what you would expect to find on your typical horse farm?

A: No.

Q: Okay. In the horse farming industry, as you know it, and you've worked in that field, I know you're interest-

ed in horses and the horse farming field as you know it, is there any agricultural purpose that you're aware of, for horses to be in the condition that they were found in this case?

A: Not that I know of, and if there were, I certainly wouldn't want to be involved with it.

N.T., 10/30/91, at 53–54. Asked by defense counsel whether the practice in question existed, the witness replied, "Yes, it does, unfortunately" (N.T., 10/30/91, at 54).

Appellants also refer us to the testimony of Richard Gilmore, a farmer and lawyer, concerning, in defense counsel's words, "various practices in the farming industry that might be considered cruel except for the fact they are practices within the industry" (N.T., 10/30/91, at 9). These practices include the castration of pigs, the raising of veal calves in confined quarters, and the raising of chickens in cages. Mr. Gilmore acknowledged that he had never been involved in horse farming.

■ We conclude that the testimony quoted above does not establish appellants' inclusion within the statutory exception for a "normal agricultural operation." As to the practice at issue, raising horses to be sent to "killer pens" and then sold for dog food, we have only the testimony of two witnesses, and their testimony is somewhat inconsistent with regard to both the severity and the prevalence of the practice. More importantly, as the trial court noted, appellants cite no testimony indicating that in fact they were in the business of raising horses to be sold for dog food or that they had formed the definite intention of sending the horses in question to "killer pens" for that purpose.[3] Accordingly, we conclude that appellants have failed to bring themselves within the purview of the exception for "normal agricultural operation[s]," and their challenge to the sufficiency of the evidence is without merit.

Judgments of sentence affirmed.

3. Appellants did not testify at, or in fact attend, their nonjury trial.