2022 PA Super 37

| | | |
|---|---|---|
| IN RE: PRIVATE CRIMINAL COMPLAINT FILED BY ANIMAL OUTLOOK | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: ANIMAL OUTLOOK | : | No. 374 MDA 2021 |

Appeal from the Order Entered February 22, 2021
In the Court of Common Pleas of Franklin County Criminal Division at
No(s):  CP-28-MD-0000389-2020

BEFORE:  BOWES, J., OLSON, J., and KING, J.

OPINION BY BOWES, J.:                    **FILED: FEBRUARY 28, 2022**

Animal Outlook ("AO") appeals from the order that dismissed its petition for review of the disapproval of the Franklin County District Attorney's Office ("DA") of multiple private criminal complaints.  We affirm in part, reverse in part, and remand with instructions.

For approximately two months at the end of 2018, Briana Taylor Ayers, an "undercover agent" for AO,[1] held employment at Martin Farms, a dairy farm in Franklin County, Pennsylvania.  During that time, Ms. Ayers captured video images of the condition and treatment of the animals on the farm which AO maintains constituted criminal animal cruelty.  For example, Ms. Ayers witnessed multiple instances of individuals improperly restraining calves,

---

[1] At that time, AO was known as Compassion Over Killing ("COK").  For ease of discussion, we refer to both organizations as AO throughout this Opinion.

which were unanesthetized to save time and money, and then using inadequately hot equipment to slowly burn away the animals' horns while they struggled, vocalized, and exhibited other signs of pain. *See* Petition for Review, 10/6/20, at Appendix 2 of Attachment C, pages 15-21. Ms. Ayers also documented instances of cows who were unable to stand and walk ("downer cows") being improperly pushed and dragged with a tractor bucket. *Id*. at pages 8-13. She also witnessed incidents of gratuitous cruelty, not captured on video, such as punching and twisting the tails of cows until they vocalized, and excessively shocking animals with a prod in sensitive areas. *Id*. at pages 30,36-37.

AO promptly (1) compiled a report of its "undercover operation" at Martin Farms, including a table of 327 incidents witnessed by Ms. Ayers, many of which were also captured on video; (2) obtained a letter from Holly Cheever, DVM, opining as to the cruelty of specific practices depicted in the evidence; and (3) prepared a legal memorandum detailing how each of the incidents constituted a violation of Pennsylvania's laws against animal cruelty by one or more Martin Farms actors, referencing therein Dr. Cheever's letter as well as manuals and other literature concerning proper dairy farm procedures. Dr. Cheever identified multiple instances of "practices shown in the video that are clearly in violation of proper humane dairy cow management." Dr. Cheever Opinion Letter, 1/25/19, at unnumbered 1. For example, Dr. Cheever found the footage of the calf dehorning "the most

disturbing, not only due to the extreme pain that these calves experience as part of their skull is burned away, but also because it is a glaring example of dairy mismanagement that results in cruelty." *Id*. at unnumbered 2.

AO submitted the gathered information to the pertinent authorities in January 2019. The Pennsylvania State Police ("PSP") initiated an investigation which it did not conclude until more than a year later. The PSP interviewed Martin Farms' owner Joshua Martin, obtained written responses to questions from him, including evaluations by the National Dairy FARM Program,[2] reviewed correspondence from the veterinarian and nutrition management consultants who provide services to Martin Farms, and obtained an opinion letter from David R. Wolfgang, DVM, MPH, who had retired from veterinary practice and the faculty at Pennsylvania State University. Specifically, in a letter supplied by Mr. Martin, Daniel Oliver, DVM, indicated that Martin Farms had been a client of his practice for over thirty-five years, that he visits the farm "at least every other week," and that he never witnessed cruelty or abuse while he was there. PSP General Offense Report at 103. Dr. Wolfgang reviewed the AO video and, while critical of some of the practices depicted, opined that they appeared to be the result of poor training and supervision

---

[2] The National Dairy Farmers Assuring Responsible Management ("FARM") Program is a voluntary program established by the National Milk Producers Federation to assure consumers of the humane and responsible treatment of dairy cows. Ninety-eight percent of the U.S. milk supply comes from participants in the program, of which Martin Farms is one. *See* AO's brief at 13-14; PSP General Offense Report at 107.

more than willful cruelty, and suggested additional training as soon as possible.  *See* Dr. Wolfgang Opinion Letter, 2/20/20, at 4-5.  Ultimately, in March 2020, the PSP issued a press release indicating that the DA had declined prosecution, also noting that Martin Farms "has proactively taken steps to improve training and stockmanship and has changed certain procedures related to the handling of calves on the farm."  Petition for Review, 10/6/20, at Attachment B.

Undeterred, AO drafted private criminal complaints against Martin Farms and fourteen of its employees or former employees,[3] alleging violations of various animal cruelty statutes, and submitted them, along with the documentation AO had supplied to the PSP, to the local Magisterial District Judge on July 27, 2020.  By letter of August 17, 2020, the Magisterial District Judge indicated that the DA disapproved all of the complaints as lacking merit. *See id*. at Attachment D.

On October 6, 2020, AO filed a petition of review of the disapproval of its private complaints pursuant to Pa.R.Crim.P. 506(B)(1).  The trial court ordered the DA to file an answer to the petition, which it did on October 14, 2020, explaining that it disapproved the complaints based solely upon the evidence and the law.  The trial court determined that the DA's proffered

---

[3]  Harman Meyerhoff, who oversaw most of the employees and who was implicated in many of the abuse allegations discussed in this appeal, ceased to be employed by Martin Farms in March 2019.  *See* PSP General Offense Report at 100, 122.

reason prompted a *de novo* review. After the trial court "reviewed and considered all submitted materials," it concluded that the DA correctly determined "that there was not enough evidence, based upon the law, to initiate prosecution against any of the Defendants alleged in the private criminal complaints." Trial Court Opinion, 2/22/21, at 10. Consequently, it entered an order dismissing AO's petition for review.

AO filed a timely notice of appeal, and both AO and the trial court complied with Pa.R.A.P. 1925. AO presents the following questions for our determination:

A. Whether the lower court erred in finding that acts widely condemned in the agriculture industry are exempted from prosecution for animal cruelty and neglect by the "normal agricultural operation" exemption in 18 Pa.C.S. § 5560.

B. Whether the lower court erred by manufacturing a requirement that only "willful" misconduct is subject to criminal prosecution for neglect under 18 Pa.C.S. § 5532(a) and cruelty under 18 Pa.C.S. § 5533(a).

C. Whether the lower court erred when it found that sick and injured cows left to languish and suffer without proper medical attention were not deprived of the "necessary veterinary care" required by the neglect statute, 18 Pa.C.S. § 5532(a).

AO's brief at 7-8 (cleaned up).

Rather than address AO's questions *seriatim*, we find it most expeditious to consider the issues raised therein after a thorough examination of all the applicable legal principles. We begin with an overview of the considerations

pertinent to the approval or disapproval of a private criminal complaint, which this Court aptly summarized as follows:

> A private criminal complaint must at the outset set forth a *prima facie* case of criminal conduct. Nevertheless, even a well-crafted private criminal complaint cannot be the end of the inquiry for the prosecutor. The district attorney must investigate the allegations of the complaint to permit a proper decision whether to approve or disapprove the complaint. Such investigation is not necessary where the allegations of criminal conduct in the complaint are unsupported by factual averments. Both the district attorney and the trial court have a responsibility to prevent the misuse of judicial and prosecutorial resources in the pursuit of futile prosecutions.
>
> Moreover, [e]ven if the facts recited in the complaint make out a *prima facie* case, the district attorney cannot blindly bring charges, particularly where an investigation may cause him to question their validity. Forcing the prosecutor to bring charges in every instance where a complaint sets out a *prima facie* case would compel the district attorney to bring cases he suspects, or has concluded via investigation, are meritless. The public prosecutor is duty bound to bring only those cases that are appropriate for prosecution. This duty continues throughout a criminal proceeding and obligates the district attorney to withdraw charges when he concludes, after investigation, that the prosecution lacks a legal basis.
>
> The district attorney is permitted to exercise sound discretion to refrain from proceeding in a criminal case whenever he, in good faith, thinks that the prosecution would not serve the best interests of the state. This decision not to prosecute may be implemented by the district attorney's refusal to approve the private criminal complaint at the outset.

*In re Ullman*, 995 A.2d 1207, 1213–14 (Pa Super. 2010) (cleaned up)

The standards that a trial court and this Court apply in reviewing a prosecutor's disapproval of a complaint depend on the reasons proffered for its rejections. As we have explained:

> When the district attorney disapproves a private criminal complaint solely on the basis of legal conclusions, the trial court undertakes *de novo* review of the matter. Thereafter, the appellate court will review the trial court's decision for an error of law. As with all questions of law, the appellate standard of review is *de novo* and the appellate scope of review is plenary.
>
> When the district attorney disapproves a private criminal complaint on wholly policy considerations, or on a hybrid of legal and policy considerations, the trial court's standard of review of the district attorney's decision is abuse of discretion. This deferential standard recognizes the limitations on judicial power to interfere with the district attorney's discretion in these kinds of decisions.

*In re Miles*, 170 A.3d 530, 534-35 (Pa.Super. 2017) (cleaned up).

In the instant case, the trial court and AO maintain that the DA offered solely legal conclusions as the basis for its decision, such that this Court should conduct a *de novo*, plenary review. **See** AO's reply brief at 9-15; Trial Court Opinion, 2/22/21, at 3. The DA, on the other hand, suggests that its decision was informed by a hybrid of legal and policy reasons, requiring application of the more deferential abuse-of-discretion standard. **See** DA's brief at 3.

Our examination of the certified record reveals that the DA's initial stated basis for denial of AO's private complaint was "a lack of merit." Petition for Review, 10/6/20, at Attachment D. When directed by the trial court to respond to AO's petition for review, the DA maintained that it disapproved the complaint "based solely upon the submitted evidence and the law." DA's Answer to Petition for Review, 10/14/20, at unnumbered 3. We agree with the trial court and AO that these statements reflect a legal basis, rather than a policy basis, for the disapproval. **See Com. ex rel. Guarrasi v. Carroll**,

- 7 -

979 A.2d 383, 385 (Pa.Super. 2009) (contrasting the lack of evidentiary merit to establish a *prima facie* case as a legal reason for disapproval, versus a policy reason that prosecution would not serve the public interest). Hence, we must undertake a *de novo* review to determine whether the DA correctly concluded that the evidence proffered by AO failed to establish any of the offenses alleged in the private criminal complaints. ***See***, ***e.g.***, ***In re Hamelly***, 200 A.3d 97, 104 (Pa.Super. 2018) (examining the evidence supplied by the appellant to determine whether it established the elements of the crimes alleged).

In its complaints, AO alleged that Martin Farms itself, as well Josh Martin and various employees, violated three statutes prohibiting cruelty to animals. The first is neglect of animal, which provides as follows:

> **(a) Offense defined.--**A person commits an offense if the person fails to provide for the basic needs of each animal to which the person has a duty of care, whether belonging to himself or otherwise, including any of the following:
>
> > (1) Necessary sustenance and potable water.
> >
> > (2) Access to clean and sanitary shelter and protection from the weather. The shelter must be sufficient to permit the animal to retain body heat and keep the animal dry.
> >
> > (3) Necessary veterinary care.
>
> **(b) Grading.--**
>
> > (1) Except as set forth in paragraph (2), a violation of this section is a summary offense.
> >
> > (2) If the violation causes bodily injury to the animal or places the animal at imminent risk of serious bodily injury,

> a violation of this section is a misdemeanor of the third degree.

18 Pa.C.S. § 5532.

Since § 5532 provides no express *mens rea* element, to the extent that a violation is charged as a misdemeanor, the Commonwealth must establish that the defendant acted at least recklessly. ***See*** 18 Pa.C.S. § 302(c) ("When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto."). However, to the extent that neglect of animal is charged as a summary offense, no level of culpability need be proved to obtain a conviction. ***See*** 18 Pa.C.S. § 305(a) ("The requirements of culpability prescribed by section 301 of this title (relating to requirement of voluntary act) and section 302 of this title (relating to general requirements of culpability) do not apply to: (1) summary offenses, unless the requirement involved is included in the definition of the offense or the court determines that its application is consistent with effective enforcement of the law defining the offense[.]").

The second offense alleged by AO, cruelty to animal, states: "A person commits an offense if the person intentionally, knowingly or recklessly illtreats, overloads, beats, abandons or abuses an animal." 18 Pa.C.S. § 5533(a). The express culpability requirements for the cruelty offense apply equally whether it is graded as a summary offense or, in cases causing bodily

injury or imminent risk of serious bodily injury to the animal, it is a second-degree misdemeanor. *See* 18 Pa.C.S. § 5533(b).

Finally, the statute proscribing aggravated cruelty to animals as a third-degree felony provides as follows:

> **(a) Offense defined.--**A person commits an offense if the person intentionally or knowingly does any of the following:
>
> > (1) Tortures an animal.
> >
> > (2) Violates section 5532 (relating to neglect of animal) or 5533 (relating to cruelty to animal) causing serious bodily injury to the animal or the death of the animal.

18 Pa.C.S. § 5534(a). Our legislature has offered the following definition for the term "torture" as used in this statute:

> Any of the following acts directed toward or against an animal unless directed to be performed by a licensed doctor of veterinary medicine acting within the normal scope of practice:
>
> > (1) Breaking, severing or severely impairing limbs.
> >
> > (2) Inflicting severe and prolonged pain from burning, crushing or wounding.
> >
> > (3) Causing or allowing severe and prolonged pain through prolonged deprivation of food or sustenance without veterinary care.

18 Pa.C.S. § 5531. Serious bodily injury is defined as "[b]odily injury that creates a substantial risk of death or causes serious, permanent disfigurement or protracted loss or impairment of the function of a bodily member or organ."

*Id*.

Our legislature has exempted normal agricultural operations from being prosecuted under any of these statutes.[4] Specifically, "Sections 5532 (relating to neglect of animal), 5533 (relating to cruelty to animal), 5534 (relating to aggravated cruelty to animal), 5536 (relating to tethering of unattended dog) and 5543 (relating to animal fighting) shall not apply to activity undertaken in a normal agricultural operation." 18 Pa.C.S. § 5560. Normal agricultural operations are "[n]ormal activities, practices and procedures that farmers adopt, use or engage in year after year in the production and preparation for market of poultry, livestock and their products in the production and harvesting of agricultural, agronomic, horticultural, silvicultural and aquicultural crops and commodities."[5] 18 Pa.C.S. § 5531.

Normal means "conforming with or constituting an accepted standard, model, or pattern; natural; standard; regular." **Commonwealth v. Barnes**,

---

[4] The normal agricultural operations exemption is a defense, rather than part of the Commonwealth's *prima facie* case under the cruelty statutes. Nonetheless, we agree with the DA that its applicability is properly considered by the prosecution in determining whether there is a sufficient legal basis to pursue the private criminal complaint, for, once properly raised, the Commonwealth would have the burden to disprove the defense at trial. **See Commonwealth v. Barnes**, 629 A.2d 123, 130 (Pa.Super. 1993).

[5] The trial court in its opinion did not reference the definition of normal agricultural operations provided in the Crimes Code in connection with the animal cruelty statutes. Rather, it discussed the definition provided in 3 P.S. § 952, which concerns the protection of agribusiness from nuisance lawsuits and local ordinances. **See** Trial Court Opinion, 2/22/21, at 5 n.6. Such was legal error.

629 A.2d 123, 129 (Pa.Super. 1993) (cleaned up).[6] As such, the exception only applies when the conduct is an accepted standard within the agricultural industry and the defendant acted in the course of business within that industry. *Id*. at 132. Thus, our legislature has made the policy determination that torture and other acts of cruelty that constitute animal abuse when done by laypersons are not subject to prosecution if the acts are (1) done by farmers and (2) are established practices accepted throughout the relevant farming industry for the production of food.

With these principles in mind, we turn to the trial court's assessment of the law and evidence in this case. The trial court offered the following explanation for its determination that none of the hundreds of incidents documented by AO, in conjunction with its expert and other evidence, was sufficient to establish the elements of a crime:

> This court has conducted its *de novo* review as the law requires; we have reviewed and considered all submitted materials related to this matter. We agree with the [DA] that there was not enough evidence, based upon the law, to initiate

---

[6] There is a dearth of authority on the interpretation and application of the normal agricultural operations exception. Indeed, **Barnes**, which we address in greater detail *infra*, is one of only two Pennsylvania cases that discusses it. The other, **Commonwealth v. Balog**, 672 A.2d 319 (Pa.Super. 1996), offers no additional guidance in the instant appeal. In **Balog**, the defendant who was convicted of cruelty to animals (gamecocks) challenged as overbroad a now-repealed statute which made it a felony to train and possess animals for fighting. An additional issue he raised on appeal was whether the trial court erred in failing to instruct the jury as to the normal agricultural operations defense. We held that the defense was not implicated, as there was no evidence that the defendant raised his birds for market, and he conceded that he did not engage in farming as a business. *Id*. at 323-24.

prosecution against any of the defendants alleged in the private criminal complaints. In regards to 18 Pa.C.S. § 5532 — Neglect of Animal, we found nothing to support that any of the animals were deprived of (1) necessary sustenance and potable water; (2) access to clean and sanitary shelter and protection from the weather; and/or (3) necessary veterinary care. Additionally, we have found nothing to support a violation of 18 Pa.C.S. § 5533 — Cruelty to Animal, which requires that a person "intentionally, knowingly or recklessly ill-treats, overloads, beats, abandons or abuses an animal." It can certainly be argued that certain procedures/practices on the farm may have constituted negligence;[10] however, negligence does not rise to the level of criminal abuse/neglect. Furthermore, we find that Defendants did not violate 18 Pa.C.S. § 5534 — Aggravated Cruelty to Animal, as we find no violation of Sections 5532 and 5533. Moreover, we have found no evidence contained within the materials to support a finding that Defendants tortured an animal as defined by the statute.

_____

[10] We note that Martin[ Farms] voluntarily implemented changes to a number of procedures/practices utilized on the farm.

Many of the allegations contained within AO's private criminal complaints, which were compiled by Briana Ayers over the course of fifty-one days in late 2018, are in direct conflict with the reports and observations of professionals who have been working with Martin Farm's [*sic*] for years. Dr. Wolfgang's report/opinion attempts to reconcile these conflicts. To touch base on a few, AO alleged denial of veterinary care in relation to cattle suffering from a condition known as lower displaced abomasum (LDA) when an employee performed procedures attempting to rectify the condition rather than a licensed veterinarian. This was dismissed by Dr. Oliver, the farm[']s veterinarian for over thirty-five years, when he confirmed that these activities are allowed to be performed by trained employees of the farm. In another instance, AO alleged that employees were spraying cows in the face with scalding hot water in the milking parlor. This allegation is also without merit, as the video shows employees washing off their hands with the same hose with no reaction and the cows do not react as though the water was scalding hot. AO also alleged an employee hitting some cattle on the hind end rose to the level of cruelty/abuse, however, in the video it is clear that the cattle do not react to this as if in pain

- 13 -

and/or as if injured. Finally, AO alleged several injuries and/or illnesses to some cattle, however, these were found to be common injuries suffered by cattle and Dr. Wolfgang did not note anything that would be considered out of the ordinary or above a normal percentage of occurrence.

Trial Court Opinion, 2/22/21, at 10-11 (cleaned up).

We agree with AO that the trial court committed multiple errors of law in rendering its decision. First, we observe that the trial court, in considering whether a *prima facie* case exists, did not view the evidence in the light most favorable to moving forward with a prosecution and failed to "consider all reasonable inferences based on that evidence which could support a guilty verdict." ***Commonwealth v. Landis***, 48 A.3d 432, 444 (Pa.Super. 2012) (cleaned up). For example, the trial court credited the evidence of Dr. Oliver, the veterinarian employed by Martin Farms for decades, and a favorable inspection conducted by the National Dairy FARM Program conducted on March 8, 2019. However, the fact that Martin Farms employees did not commit documented abuse of the animals while the farm was being inspected, or when Dr. Oliver was on the premises a couple of times per month, does not mean that the abuse Ms. Ayers witnessed did not happen or that her statements should be wholly disregarded.

Indeed, Dr. Wolfgang's report addressed the conflict between AO's evidence and the reports of the consultants and other experts who visited the farm by observing: "[I]t appears that what happens in practice for special needs cattle and calves is neither as sophisticated nor effective as it should

be. What actually happens may be quite different than what dairy ownership and veterinary practitioners believe is happening." Dr. Wolfgang Opinion Letter, 2/10/20, at 4. Furthermore, the certified record reflects that the PSP were contacted by Adam Patterson, who had been employed at Martin Farms in the summer of 2018, and indicated that "he saw many of the workers mistreat and abuse the animals." PSP General Offense Report at 101, 149. Mr. Patterson also stated that he was available if additional information was needed. *Id*. While the PSP file does not detail the abuse Mr. Patterson allegedly witnessed, or whether there was additional follow up with him after the April 13, 2019 interview, this record suggests that Ms. Ayers and AO are not the only source of evidence to contradict the reports of Dr. Oliver and other professionals who maintain a financial relationship with Martin Farms. In any event, the trial court's duty was to determine whether there was evidence proffered to satisfy each element of an offense, not to make credibility determinations and conduct fact-finding. ***See Landis***, ***supra*** at 444 ("[T]he *prima facie* case merely requires evidence of the existence of each element of the crime charged. . . . The weight and credibility of the evidence is not a factor at this stage." (cleaned up)).

Second, the trial court, as did the PSP, made a point of noting that Martin Farms had voluntarily changed some of its practices. The fact that the farm stopped committing or allowing the arguably-criminal acts does not negate culpability for any past crimes perpetrated upon the animals. We are

not considering enforcement of an administrative regulatory scheme seeking future compliance with better farming practices. We instead face proposed criminal actions vindicating laws that our legislature has deemed to be crimes against the people of this commonwealth. That remedial measures were taken here does not affect liability for prior criminal acts any more than the fact that a defendant stopped selling drugs would absolve him from prosecution for past drugs sold. While such voluntary changes and the termination of the employment of the supervisor connected with many of the claims of abuse are certainly positive developments, and arguably could support a policy-based decision by the DA not to prosecute, they have no bearing on the legal sufficiency basis at issue in the instant case.

Next, and most consequential, the trial court erred in dismissing AO's petition in its entirety while addressing only a hand-picked few of the alleged instances of abuse. The trial court did not detail a *de novo* review of the entire record to determine whether AO submitted evidence sufficient to establish any of the alleged crimes. Rather, the trial court referenced only the evidence obtained by the PSP that supported the DA's decision to disapprove the criminal complaints.[7] ***Cf. In re Hamelly***, ***supra*** at 104 (examining the

---

[7] On appeal, the DA persists in arguing the propriety of its decision based upon the video evidence submitted by AO and the fruits of the PSP's investigation without addressing the expert opinion evidence supplied by AO. ***See*** DA's brief at 6-7 (indicating that the DA reviewed "the extensive investigations of PSP and the video evidence provided by [AO]'s undercover
*(Footnote Continued Next Page)*

evidence supplied by the appellant to determine whether it established the elements of the crimes alleged).

The trial court offered no explanation why the evidence concerning the movement of downed cows, the excessive shocking or tail pulling that was reported by Ms. Ayers but not recorded on video, or the practices used in the dehorning of calves was insufficient.[8] Dr. Cheever opined that Martin Farms' use of heavy machinery to push a cow along a concrete floor was improper and "very painful." Dr. Cheever Opinion Letter, 1/25/19, at unnumbered 1. Dr. Wolfgang did not contradict Dr. Cheever as to the impropriety and painfulness of the movement of the downer cows, but merely suggested that the video evinced no **gross** cruelty because it appeared to him that the employees on the video tried to be gentle and made efforts not to drag the animals. *See* Dr. Wolfgang Opinion Letter, 2/10/20, at 2. However, gross cruelty is not an element of the crimes alleged. Arguably, these incidents

_____

personnel," but concluded that the culpability elements of the offenses "could not be addressed with the evidence at hand based upon Dr. Wolfgang's letter").

[8] AO's complaints alleged many additional incidents, from improperly butchering euthanized animals, to spraying cows with scalding water, to unsanitary conditions. However, AO does not present arguments as to these allegations with specificity on appeal. Since it is not the role of this Court to act as counsel and formulate arguments as to the additional allegations, we affirm the trial court's dismissal of the petition for review as to the instances of abuse not addressed in our Opinion. *See*, *e.g.*, *Commonwealth v. Johnson*, 236 A.3d 1141, 1151 (Pa.Super. 2020) (explaining that this Court will not develop arguments on behalf of an appellant, but may find insufficiently briefed issues waived).

amounted to reckless ill-treatment or abuse of the animals in violation of 18 Pa.C.S. § 5533(a).

AO also alleged, through the reports of Ms. Ayers about incidents not captured on video, that Martin Farms employees engaged in intentional cruel acts such as twisting the tails of cows until they vocalized and excessively shocking animals multiple times. *See* Petition for Review, 10/6/20, at Appendix 2 of Attachment C, at pages 30, 36-37. Again, Dr. Wolfgang's opinion letter did not support rejection of these claims. He noted that the video did not reveal the "gross cruelty as alleged in some of the incidents," but acknowledged that the allegations of Ms. Ayers of multiple shocks in excess of one to three issued "in rapid sequence for an animal which could not move or get up could be considered cruel." Dr. Wolfgang Opinion Letter, 2/10/20, at 2. Likewise, he did not dispute that excessive tail twisting constituted cruelty, he only indicated that "no extreme examples were noted" on the video recording. *Id*. at 3. If a fact finder credited Ms. Ayers' testimony about these instances of intentional abuse, it could convict for cruelty pursuant to 18 Pa.C.S. § 5533(a).

The most obvious evidence overlooked by the trial court was that concerning the dehorning of calves. Dr. Cheever explained that the technique used by Martin Farms as shown in the video caused the calves to be "in agonizing pain, shown by their violent thrashing and bellowing." Dr. Cheever Opinion Letter, 125/19, at unnumbered 2. Dr. Wolfgang agreed that the

reaction of the calves indicated that little or no pain mediation was provided to the animals, and also volunteered that "the time the hot iron was applied was much greater than necessary." Dr. Wolfgang Opinion Letter, 2/10/20, at 3. Given the extreme agonizing reaction of the young animals to having a hot iron applied to their heads for an excessive amount of time without anesthesia beforehand or pain relief afterwards, a fact finder could conclude that the perpetrators of the dehorning grossly deviated from how a reasonable person would proceed and disregarded a substantial and unjustifiable risk that he or she would cause severe and prolonged pain to the animals. *See* 18 Pa.C.S. § 302(b)(3) (defining reckless culpability). Such would support a conviction of aggravated cruelty pursuant to 18 Pa.C.S. § 5534(a)(1) (defining aggravated cruelty to include torture), and 18 Pa.C.S. § 5531 (defining torture to include "[i]nflicting severe and prolonged pain from **burning**, crushing or wounding" (emphasis added)). It also constitutes sufficient evidence for cruelty, as well as neglect for the failure to provide necessary medical care, pursuant to 18 Pa.C.S. §§ 5533 and 5532, respectively.[9]

---

[9] In its opinion, the trial court acknowledged that the evidence perhaps showed negligence but stated that negligence was an insufficient level of culpability under the statutes. However, as noted above, proof of negligence may support a conviction for neglect of animal as a summary offense. *See* 18 Pa.C.S. §§ 5532(b)(1), 305(a). Thus, at the very least, the trial court should have ruled that the evidence was sufficient to establish a *prima facie* case of summary neglect where the animals went without necessary veterinary care.

Accordingly, we conclude that AO provided sufficient evidence to show *prima facie* cases of neglect, cruelty, and aggravated cruelty with respect to the incidents discussed above. We must next consider whether the certified record also contains evidence to invoke the normal agricultural operations defense and, if so, sufficient evidence which, viewed in the light most favorable to a prosecution, would disprove the invocation of the defense.

The DA maintains that the normal agricultural operations exemption applies to the conduct at issue in this case because Martin Farms and its employees, although "likely poorly trained and not effectively supervised" had "presumably for years . . . used the methods that can be seen in the video in question." DA's brief at 16. The DA further argues that the failure of Martin Farms and its employees to meet the standards recommended by industry groups does not render their acts criminal. The DA contends that such organizations offer guidance "to improve farming techniques" and provide "more efficient and modern ways to farm," but that farmers who "cannot catch up with the innovations within the industry" do not become "criminally accountable" for their "using a worse way to farm." DA's brief at 17. Thus, the proposed defendants' use of "the natural, standard, and common methods to farm which they were poorly trained to do" did not rise to the level of "utter criminal and malicious neglect." *Id*. at 16-17.

We initially observe that Martin Farms is certainly an agricultural operation, and that the evidence indicates that the proposed defendants would

be able to invoke the exception for normal agricultural operations at trial. We also agree with the DA that industry group standards or suggestions do not set the line between criminal and non-criminal acts, and that knowledge, or lack thereof, of the recommendations of such groups is not pertinent to whether the individual actors acted knowingly or recklessly in harming the animals. As mentioned *supra*, for purposes of proving that a person committed criminal animal abuse, aggravated abuse, or misdemeanor neglect, the question is whether the individual acted at least recklessly, which means the defendant disregarded a substantial and unjustifiable risk that he or she knew would cause an animal to suffer neglect or cruelty by grossly deviating from the conduct that a reasonable person would have observed in his or her situation. *See* 18 Pa.C.S. § 302(b)(3). This standard applies equally to all people within and without the business of agriculture and is an objective one to the extent that it incorporates consideration of what a reasonable person would have done. To issue a conviction to any of the proposed defendants, a fact finder would be required to find, without regard to agricultural industry groups' recommendations or guidelines, that the defendant acted in a way that was a gross deviation from what a reasonable person would have done in the circumstances.

However, our legislature has decided that a defendant who recklessly, knowingly, or intentionally abused or even tortured an animal, is nonetheless entitled to an acquittal if his or her conduct conformed with "an accepted

standard, model, or pattern; natural; standard; regular" practice within the dairy industry.[10]  **Barnes**, **supra** at 129 (cleaned up).  We reject the DA's position—that what is regular and standard is viewed narrowly within the context of the particular defendant's agricultural operation—as both contrary to the plain language of the statute as interpreted in **Barnes**, and as absurd. Pursuant to the DA's interpretation, we would have to accept as "normal" something done for many years by a single farmer even if it was and had always been rejected by everyone else in the pertinent agricultural industry. The **Barnes** decision makes it clear that a wider view of agricultural operations must be considered in determining what practices are normal and accepted.[11]

_____

[10]  Dr. Cheever's opinion letter states that Martin Farms' "neglect, abuse, and rough handling of their bovine stock rises to the level of cruelty in many instances, and claiming that such practices are standard in dairy production does not absolve them from being cruel and in violation of humane treatment laws."  Dr. Cheever Letter, 1/25/19, at unnumbered page 2.  This is an incorrect statement of the law, as any cruel practice that is standard in dairy production is as a matter of law expressly absolved by the normal agricultural operations exemption.

[11]   In **Barnes**, the defendants were convicted of cruelty to animals in connection with the discovery on their farm of undernourished horses suffering from untreated severe, chronic health conditions and challenged the sufficiency of the evidence to sustain their convictions.   The defendants maintained that it was "a normal practice in the horse farming business to neglect horses that are no longer wanted and are going to be sent to 'killer pens' at the livestock auction and then sold for dog food."  **Commonwealth v. Barnes**, 629 A.2d 123, 129 (Pa.Super. 1993).  After determining the meaning and application of the normal agricultural operations exception as discussed above, this Court held that the evidence did not establish that the defendants fell within the exception.  Specifically, we held that the evidence as to how such horses are treated once they are designated to be sent for use
*(Footnote Continued Next Page)*

Therefore, to determine whether there is adequate evidence to disprove a normal-agricultural-operations defense, we must ascertain whether the certified record contains sufficient evidence that the activities at issue fell outside the bounds of what is considered standard and accepted within the dairy farming industry. Certainly, the recommendations and guidelines of industry groups are pertinent to this inquiry to the extent that they are widely accepted or regular.[12]

With regard to the moving of downer cows, AO explained that the National Dairy FARM Program's Animal Care Reference Manual specifies that downer cows are "not to be pulled, dragged or otherwise moved through mechanical force applied directly to the animal," and that the "movement of

_____

as dog food was meager and "somewhat inconsistent with regard to both the severity and the prevalence of the practice." *Id*. at 132. Moreover, we observed that the defendants cited no evidence that they were in the business of raising horses for dog food or that they had decided to send the horses in question to a killer pen for such use. Therefore, we held that the defendants "failed to bring themselves within the purview of the exception for normal agricultural operations, and their challenge to the sufficiency of the evidence [wa]s without merit." *Id*. at 132-33 (cleaned up).

[12] AO points out that the trial court, in ruling that the evidence did not rise to the level of recklessness, acknowledged that some of the practices at Martin Farms "may have constituted negligence." Trial Court Opinion, 2/22/21, at 10. AO observes that this means that, by definition, those practices were done with the absence of ordinary care. *See* AO's brief at 27. However, the trial court also stated that none of the conduct at issue "would be considered out of the ordinary or above a normal percentage of occurrence." Trial Court Opinion, 2/22/21, at 11. AO posits that the trial court's reasoning is flawed, because something cannot both deviate from the ordinary and be normal, standard, and regular. *See* AO's brief at 27-28. We agree with AO's logic but base our decision on the more concrete bases discussed *infra*.

non-ambulatory cattle in a manner inconsistent with National Dairy FARM guidelines" amounted to willful mistreatment.[13] *See* Petition for Review, 10/6/20, at Attachment F, pages 12-13, 19. AO also produced the opinion letter of Dr. Cheever that pushing the animals with machinery was very painful, and that humane use of heavy machinery to move downer cows instead requires the use of padding in the bucket and the gentle rolling of the cow into it. *See* Dr. Cheever Opinion Letter, 1/25/19, at unnumbered 1. Mr. Martin himself agreed with Dr. Cheever's assessment, acknowledging that his employees were supposed "to use a halter and then push the cattle into the bucket manually." PSP General Offense Report at 100 (April 15, 2019 PSP interview of Joshua Martin). Further, Dr. Wolfgang did not indicate that the techniques depicted on the video for moving downer cows was standard or accepted, merely that such reflected clumsiness or poor training as opposed to gross cruelty. *See* Dr. Wolfgang Opinion Letter, 2/10/20, at 2. We conclude that this evidence was sufficient at this nascent stage to render the disapproval of the complaints based upon the normal agricultural operations exception legally incorrect.

---

[13] As noted earlier, Martin Farms is a participant in the FARM Program, endorsed by the producers of nearly all of the nation's milk. Mr. Martin supplied an evaluation conducted pursuant to the Program to the PSP, as well as a copy of the Program's Dairy Cattle Care Ethics Agreement which it required its employees, or at least Ms. Ayers, to sign. *See* PSP General Offense Report at 119.

As for the tail twisting and repeated electric shocks, AO likewise cited the National Dairy FARM Program's Animal Care Reference Manual to establish that "the tail must never be used aggressively to move a cow," and that "needlessly applying any type of prod to a sensitive part of an animal" was contrary to industry standards. *See* Petition for Review, 10/6/20, at Attachment F, pages 25-26. Dr. Wolfgang indicated that "some tail holding and pushing is to be expected in a farm," and indicated that he saw no "extreme examples" on the video. Dr. Wolfgang Opinion Letter, 2/10/20, at 3. However, as discussed above, Ms. Ayers claims to have witnessed what could be termed extreme examples that were not recorded, which would appear to fall outside the scope of what Dr. Wolfgang deems to be normal. Dr. Wolfgang also suggested that use of an electric prod one to three times to move an animal was normal and accepted but contrasted that with the type of excessive shocking and beating that Ms. Ayres claimed to witness off camera. *Id*. at 2. Hence, the evidence of record supported rejection of the excessive shocking and tail pulling as a normal and accepted within the industry.

Finally, the certified record contains extensive evidence that the technique of dehorning calves recorded by Ms. Ayers at Martin Farms was not standard or accepted within the industry. AO cited multiple authorities such as the American Association of Bovine Practitioners, for the proposition that "[h]ot-iron dehorning without anesthetic is not 'routine and accepted' within

the agriculture industry." Petition for Review, 10/6/20, at Attachment F, page 20. Dr. Cheever explained that the calves being dehorned in the video are much older than those typically dehorned with a hot iron. When calves are young, the horns are merely buds or superficial and tiny, not yet attached to the skull. When the calves are as old as the ones depicted in the Martin Farms video, the horns are well-developed and firmly attached to the skull. Further, anesthetic before the procedure and pain relief after are utilized even when the dehorning occurs at the appropriate younger age. *See* Dr. Cheever Opinion Letter, 1/25/19, at unnumbered 2. Dr. Wolfgang asserted that the industry standard for dehorning calves included a local nerve block before the procedure and pain medication afterwards, that the calves being dehorned in the video were clearly older than was detailed in the FARM inspection report, that the calves were improperly restrained to allow minimal assistance by a second person such that the calves "could throw themselves down and semi-hang during the procedure," and that the hot iron was applied excessively, causing excessive tissue destruction. Dr. Wolfgang Opinion Letter, 2/10/20, at 3. Mr. Martin confirmed to police that two employees are required to assist in the dehorning procedure, and that a local anesthetic is supposed to be administered beforehand. *See* PSP General Offense Report at 100 (April 15, 2019 PSP interview of Joshua Martin). We conclude that this evidence is sufficient to overcome the affirmative defense as a basis for rejection of the

claims concerning incidents of dehorning pled in the private criminal complaints.

In sum, the evidence that has been presented to the DA, the trial court, and this Court is sufficient to make out *prima facie* cases of animal neglect, cruelty, and aggravated cruelty with regard to the incidents of improper movement of downer cows, excessive shocking and tail pulling or twisting, and calf dehorning, as well as to establish the inapplicability of the normal agricultural operations defense as to those practices. Consequently, we reverse the trial court's dismissal of AO's petition for review to the extent that it affirmed the DA's disapproval of the charges in the private criminal complaints based upon those incidents.[14] We affirm the trial court's order in all other respects. Upon remand, the trial court shall enter an order directing

_____

[14] We note that the criminal acts alleged by AO in its private criminal complaints occurred in October, November, and December 2018. The statute of limitations for each of the alleged offenses is two years. **See** 42 Pa.C.S. § 5552(a). Therefore, prosecution of these claims, to be timely, had to have commenced in the autumn of 2020, shortly after AO filed its petition for review. A prosecution has commenced, for purposes of the statute of limitations, "either when an indictment is found or an information under section 8931(b) (relating to indictment and information) is issued, or when a warrant, summons or citation is issued, if such warrant, summons or citation is executed without unreasonable delay." 42 Pa.C.S. § 5552(e). As the parties have provided no advocacy on the issue of whether the statute of limitations is a barrier to prosecution at this stage, we decline to *sua sponte* consider that as an alternate basis to affirm the trial court's order. **See Commonwealth v. Williams**, 73 A.3d 609, 617 n.4 (Pa.Super. 2013) ("This Court is not bound by the rationale of the trial court, and we may affirm the trial court on any basis."); **see also A.S. v. Kane**, 145 A.3d 1167, 1171 (Pa.Super. 2016) (holding expiration of the statute of limitations was a valid legal basis to disapprove a private criminal complaint).

the DA to accept and transmit for prosecution pursuant to Pa.R.Crim.P. 506(B)(1) the private criminal complaints in which the defendants are implicated in the actionable incidents.[15]

Order affirmed in part and reversed in part. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/28/2022

---

[15] Specifically, the private criminal complaints which contain allegations of, and are supported by evidence of, participation in the improper movement of downer cows, excessive shocking and tail pulling or twisting, and/or cruel calf dehorning are those supplied by AO naming the following as defendants: Martin Farms, Josh Martin, Harman Meyerhoff, Samuel Batista, Selvin (Last Name Unknown), and Bryan (Last Name Unknown).